MARK RICHARD

V.

ST. TAMMANY PARISH SHERIFF'S
DEPARTMENT

CIVIL ACTION

NO. 17-9703

SECTION "F"

## ORDER AND REASONS

Before the Court is the defendant's motion to dismiss for failure to state a claim. For the following reasons, the motion to dismiss is GRANTED as to Count III, pertaining to the ADA, and DENIED as to Counts I and II, pertaining to sexual harassment under Title VII, and Counts IV and V, pertaining to the ADEA.

### Background

Mark Richard graduated from the St. Tammany Parish Sheriff's Office Police Academy on August 21, 2013 and shortly thereafter began working at the Sheriff's Office as a deputy. Beginning in fall 2015, his coworker, Deputy Patrick Penton, repeatedly made derogatory comments concerning Richard's age.[1] Richard was forty-nine years old. Richard claims that Penton would call him an "old man," ask if he could "still get it up," and made other similar comments in front of their colleagues and in public. Richard asked Penton to stop making the comments, and then informed his superior,

_____

[1] This background section is not intended to be findings of fact. It is simply an attempt to summarize the factual information presented to the Court.

Corporal Tony Holloway, but Penton did not let up. On February 3, 2016, shortly after making the complaint, two of Richard's superiors, Lieutenant Wayne Wicker and Corporal Tony Holloway notified Richard that they would suspend his ticket writing privileges until March 1, 2016. They informed Richard that they disagreed with the decision—Richard was the best field deputy on their staff—but that they were under orders from Chief Fred Oswald. Richard had the highest number of warrant arrests in his district, and had received the St. Tammany Parish Sheriff Officer's Fitness Award twice.

On March 15, 2016, Richard asked Penton to join him for dinner. There, Richard expressed that he found the derogatory age-based comments embarrassing and unprofessional and asked Penton to stop making them, especially when they were on calls in front of civilians. Penton continued to taunt Richard at dinner, asking "What are you going to do? Report me?" When Richard answered in the affirmative, Penton dismissed the threat, stating that he was close friends with their superior, Corporal Holloway.

Three hours later, Richard was patrolling on Million Dollar Road and observed a young man walking alone in the street. He pulled over, turned on his lights, and spoke with the young man. As he was obtaining his personal information, he heard a vehicle screech and turn onto the road. The vehicle was speeding towards Richard and the young man, despite the 15 mph speed limit. The

vehicle momentarily slowed, and when it was about 20-30 yards, it accelerated towards Richard, and skidded right past him. Richard alleges that the vehicle was clearly attempting to run him over. He immediately contacted dispatch and notified them of what had occurred.

The driver braked and exited from the vehicle, and stated that she did not see him. Richard then recognized her as Michaela Rodasta. He had several contacts with her over the past few years, including enforcing a court order to take her three-year-old daughter from her custody after her involvement in drug activity. Within minutes, Deputy Penton and Corporal Holloway arrived. They spoke with Rodasta, who claimed that Richard's lights were not illuminated, and dismissed her from the scene.

Three days later, Lieutenant Wayne Wicker, Richard's immediate rank, called him into his office to speak about the incident at Million Dollar Road. Although Richard vehemently claimed at the scene that he had his lights on, Deputy Penton and Corporal Holloway reported that they believed Rodasta's account that his lights were off. Richard gave Lieutenant Wicker a written statement of the incident and of the disagreement he had with Deputy Penton earlier that evening. He also stated that he wanted to make a complaint about the age harassment. Lieutenant Wicker assured him that he would make a report and that it would be considered. To Richard's knowledge, no report was ever made.

Two weeks later, on March 31, 2016, Richard slammed his hand in a car door while on a call for duty, causing an open break of his right pinky finger. He was treated at the St. Tammany Hospital emergency room and sent home on Workman's Compensation leave. Richard was out of work for eleven weeks; his injury caused nerve damage and required physical therapy. While on leave, he was contacted by Human Resources on April 5, 2016. They informed him that due to the lights incident on Million Dollar Road on March 15th, he was demoted from road patrol and assigned to the Radio Room as a dispatcher. His annual pay would be reduced by $10,000.

He returned to work on June 22, 2016 with a doctor's release that read "light duty, but no typing at all." He reported to the Radio Room for his 12-hour shifts where he typed continuously, which aggravated his injury and caused shooting pain and headaches. Furthermore, he reported sexual harassment from his Radio Room co-workers. He worked with eight females and one young male. According to the complaint, the female dispatchers used vulgar language on every shift, including Richard's immediate rank, Sergeant Amy Popper and Corporal Brittany Harbin. They discussed the "penis sizes they preferred, oral sex techniques, and positions in which they liked to have sex." They also "sen[t] a ruler around the room and each female dispatcher held the ruler and indicated the length of the penis size they preferred." On at least four occasions, Sergeant Poppler performed "what she called her 'sexy dance' . .

. where she squeezed her breast up and wiggled her butt across the office."

Richard complained of this behavior, calling it offensive and unprofessional. After about three weeks in the Radio Room, Richard was called into Lieutenant Toups' office with Sergeant Popper. They stated that it was apparent Richard was struggling in the Radio Room, and wondered why he did not participate in conversations. Richard explained that his hand still hurt from the injury and that he was experiencing shooting pain from constantly typing. Further, he stated that he carefully avoided the conversations because his participation could easily be construed as sexually offensive, and that he wanted to make a complaint of the harassment. Sergeant Popper replied that they were not used to having men in the Radio Room, and that she would talk with the others about his complaint.

When Richard returned to his desk, he was immediately assigned to Corporal Harbin as a new unscheduled trainer. Corporal Harbin instructed him to take a typing test, which he failed. He typed 22 words per minute, and a passing score is 25 words. Harbin continued to administer unannounced written exams about three times a week. For the three weeks following his meeting with Lieutenant Toups and Sergeant Popper nobody would speak to him, and the workplace environment turned increasingly hostile. On August 9, 2016 he was called to human resources. He was informed that he would be

terminated "due to [his] struggling in the Radio Room" and his slow typing pace. Richard reminded the Human Resources Sergeant that he was still recovering from his hand injury,[2] but was told that Chief Oswald had made the decision with input from Lieutenant Toups, Sergeant Popper, and Corporal Harbin. His last day of employment at St. Tammany Parish Sheriff's Office was August 9, 2016.

Richard submitted an intake questionnaire with the Equal Employment Opportunity Commission on August 24, 2016 and a formal charge of discrimination on June 20, 2017. The EEOC issued a Dismissal and Notice of Right to Sue letter on July 5, 2017. He sued St. Tammany Parish Sheriff's Department on September 27, 2017 in this Court. St. Tammany Parish Sheriff Randy Smith moved to dismiss the complaint on December 4, 2017. Sheriff Smith moved to dismiss the complaint because the sheriff department is not an entity capable of being sued. Richard ultimately submitted an amended complaint on February 6, 2018, and named Sheriff Smith as the sole defendant. In light of the amended complaint, the Court

---

[2] Later that day, Richard saw his doctor for his scheduled appointment. His doctor concluded that Richard was experiencing complications, evidenced by the significant swelling in his forearm and elbow, as a result of repetitive typing. Richard is still being treated for nerve damage from the injury.

dismissed Smith's motion without prejudice, and Sheriff Smith moved to dismiss the amended complaint on February 26, 2018.[3]

## I.

In considering a Rule 12(b)(6) motion, the Court "accept[s] all well-pleaded facts as true and view[s] all facts in the light most favorable to the plaintiff." See Thompson v. City of Waco, Texas, 764 F.3d 500, 502 (5th Cir. 2014) (citing Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys, 675 F.3d 849, 854 (5th Cir. 2012)(en banc)). But in deciding whether dismissal is warranted, the Court will not accept conclusory allegations in the complaint as true. Id. at 502-03 (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

To survive dismissal, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009)(quoting Iqbal, 556 U.S. at 678)(internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atlantic Corp. v. Twombly, 550 U.S. 544,

---

[3] Sheriff Smith moved to dismiss the complaint and the amended complaint. The amended complaint replaces the original complaint, so the amended complaint is the only complaint that may be dismissed.

555 (2007) (citations and footnote omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. at 678 (internal quotations omitted) (citing Twombly, 550 U.S. at 557). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'", thus, "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (alteration in original) (citation omitted).


II.

In his complaint, the plaintiff alleges that the defendant violated the law through five counts: (1) subjected the plaintiff to a hostile work environment, in violation of Title VII of the Civil Rights Act; (2) terminated the plaintiff's employment as

retaliation for his complaints of a sexually hostile work environment, in violation of Title VII of the Civil Rights Act; (4) discriminated against the plaintiff by failing to attempt to find a reasonable accommodation for his finger injury and disregarding his injury when assigning him to the Radio Room, in violation of the Americans with Disabilities Act; (4) subjected the plaintiff to harassment and a hostile work environment based on his age, in violation of the Age Discrimination in Employment Act; and (5) retaliated against the plaintiff for his complaints of an ageist hostile work environment, in violation of the Age Discrimination in Employment Act.

Each count of the complaint will be addressed in turn below. But as a preliminary matter, the Court must determine whether the plaintiff exhausted his administrative remedies. "Employment discrimination plaintiffs must exhaust administrative remedies before pursuing claims in federal court." <u>Taylor v. Books A Million, Inc.</u>, 296 F.3d 376, 378-79. "Exhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory notice of right to sue." <u>Id.</u> at 379. Although a "charge" is not defined, the filing of one obligates EEOC "to initiate informal dispute resolution processes." <u>Federal Exp. Corp. v. Holowecki</u>, 552 U.S. 389, 395-96, 400. The plaintiff must file the charge within 180 days after the alleged unlawful employment practice, but in "deferral states" like Louisiana, the filing

deadline is extended to 300 days. 42 U.S.C. § 2000e-5(e)(1); <u>Conner v. Louisiana Dept. of Health & Hosps.</u>, 247 Fed. Appx. 480, 481 (5th Cir. 2007)(unpublished). The last day Richard experienced any alleged discrimination is the day he was terminated, August 9, 2016, so he must have submitted a discrimination charge by June 5, 2017. Richard submitted an intake questionnaire on August 24, 2016, and filed his charge of discrimination on June 20, 2017.

The defendant contends that because Richard did not file his charge of discrimination until fifteen days after the deadline, he did not exhaust his administrative remedies, and his suit is barred. The plaintiff argues that his intake questionnaire should be considered part of the EEOC charge because he identified the parties, alleged the grounds for the charge, checked a box giving consent for the agency to look into his discrimination claims and disclose his identity to the employer,[4] and confirmed that he intended to file a charge of discrimination. The questionnaire was accompanied by a three-page statement. Because the questionnaire was detailed, Richard asserts, the charge of discrimination filed on June 20, 2017 simply finalized the allegations he already submitted and should relate back to the questionnaire.

---

[4] Richard checked Box 2, which stated, "I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name. . . ."

The survivability of Richard's claims turns on whether Richard's questionnaire constitutes a charge. The U.S. Supreme Court has held that an intake questionnaire may be a charge. For a filing to be deemed a charge, it must comply with the relevant EEOC regulations[5] and "must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle and dispute between the employer and the employee." Federal Exp. Corp. v. Holowecki, 552 U.S. 389, 402. The request-to-act requirement provides the agency a "mechanism to separate information requests from enforcement requests." The Court noted that "under this permissive standard a wide range of document might be classified as charges," but that result was acceptable because the reporting "system must be accessible to individuals who have no detailed knowledge of the relevant statutory mechanisms and agency processes." Id. at 402-03. Accordingly, the charge need not be a formal or lengthy document, but instead "can be a form, easy to complete, or an informal document, easy to draft." Id. at 403. When reviewing the questionnaire at issue in Holowecki, the Court noted that while the intake questionnaire form alone may have not requested action,

---

[5] The Court in Federal Express Corp. v. Holowecki defined charge under the Age Discrimination in Employment Act. 552 U.S. 389, 402. It held that the EEOC's regulations for the ADEA only required that the filing include "the allegation and the name of the charged party." Id.

the questionnaire was supplemented with a six-page affidavit. Id. at 405. In the affidavit, the plaintiff asked the agency to "please force [the employer] to end their age discrimination plan so we can finish out our careers absent the unfairness and hostile work environment . . . ." Id. The plaintiff also checked a box on the questionnaire, like Richard, that gave consent to the agency to disclose her identity to the employer. Id. at 406. The Court held that the request for the agency to act combined with the waiver elevated the questionnaire into a charge.[6] Id.

Richard's questionnaire is sufficient to constitute a charge. The three-page statement details the facts that are the basis for all of Richard's claims, and is nearly verbatim to the complaint. The right to sue letter states that "THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:" and then lists several boxes. One reason is "Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge." That box is unchecked. The EEOC checked the box attached to the following reason:

> The EEOC issues the follow determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained established violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made to any other issues that might be construed as having been raised *by this charge*."

---

[6] The plaintiff in Holowecki did not file a formal discrimination charge until after she filed her complaint in District Court.

(Emphasis added). The letter goes on to instruct Richard that he "may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court." The formal charge of discrimination was untimely, but the EEOC didn't conclude that Richard failed to file a timely charge, indicating that the questionnaire was sufficient to put the EEOC on notice that an investigation was needed. The purpose of the demand requirement is to notify the EEOC that investigation is needed. Thus, the Court will not bar the plaintiff's claim, especially when Richard authorized the EEOC to look into his claims and waived confidentiality. See Holowecki, 552 U.S. at 406 ("Documents filed by an employee with the EEOC should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies."); see also Becerra v. Ms. Ellie's Kitchen, No. 11-1833, 2012 WL 5363793, *4 (E.D. La. Oct. 31, 2012)(holding that a questionnaire constituted a charge, even though it had no demand statement, because the claimant selected box 2 authorizing the EEOC to investigate his claims and the EEOC began investigating the claims after receiving the questionnaire).

A.

In Count I and II of the complaint, the plaintiff alleges violations of Title VII of the Civil Rights Act. Specifically, Richard contends that he was subjected to sexual harassment when

he worked in the radio room, that management was aware and condoned the harassment, that he was subjected to a hostile work environment and retaliation once he reported the harassment, and that his complaint led to his termination.

Title VII of the Civil Rights Act of 1964 provides that "[i]t shall be unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment claims are actionable under this provision in two circumstances: (1) "[w]hen . . . a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands" (often referred to as *quid pro quo* claims); and (2) if there is "severe or pervasive" sexual harassment creating a hostile work environment."[7] Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 753-54 (1998). As to the first circumstance, "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a

_____

[7] See Casiana v. AT&T Corp., 213, F.3d 278, 283-84 (5th Cir. 2000) for a thorough road map of actionable Title VII sexual harassment claims and the defenses available based on the factual circumstances. If there is no

significant change in benefits." Id. at 761. But quid pro quo cases are typically "based on threats which are carried out,"[8] which is "distinct from bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment," the second type of actionable claim." Id. at 751.

A hostile work environment claim is only actionable if the harassment is "so 'severe or pervasive' as to 'alter the conditions of the victim's employment and create an abusive work environment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (quoting Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). For Richard's claim to be actionable under the statute, he must allege "a sexually objectionable environment" that is "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Id. at 787. When evaluating whether the workplace was hostile, courts consider the frequency and severity of the conduct, "whether it is physically threatening or humiliating," and "whether it unreasonably interferes with the employee's work performance." Id. at 787-88 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993)). "[S]imple teasing" and occasional remarks are not actionable; Title VII is not a

---

[8] See Henson v. City of Dundee, 682 F.2d 897, 910 (11th Cir. 1982) ("[In] [t]he typical case of quid pro quo sexual harassment . . . the supervisor relies upon his apparent and actual authority to extort sexual consideration from the employee.").

"general civility code." Id. (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998)). But a claim is actionable despite a lack of physical contact. Royal v. CCC&R Tres Arboles, L.L.C., 736 F.3d 396, 403 (5th Cir. 2013). Unlike quid pro quo claims, there is no requirement that the plaintiff suffer a tangible employment action. Jones v. Flagship Int'l, 793 F.2d 714, 720 (5th Cir. 1986). However, "the absence of such detriment requires a commensurately higher showing that the sexually harassing conduct was pervasive and destructive of the working environment." Id.

Richard faced a tangible employment action shortly after he complained of sexual harassment; he was fired. He illustrated an extremely uncomfortable environment where several co-workers and superiors explicitly discussed sex in an inappropriate manner in the workplace. Accordingly, his claim is only actionable if he suffered severe or pervasive sexual harassment that both he and a reasonable person would find hostile and abusive. He meets his burden at this stage of the case.

Richard alleges that his co-workers and superiors used vulgar and sexually explicit language during ever shift. They discussed oral sex techniques, debated sexual positions, and passed a ruler to every operator to inquire their preferred penis size. Additionally, on four occasions, the plaintiff's immediate rank, Sergeant Amy Poppler, allegedly performed a "sexy dance" where

"she squeezed her breasts and wiggled her butt across the office."
The defendant contends that Richard fails to allege that these
conversations interfered with his work. The Court disagrees.
Richard pleads he did not participate in the conversations out of
fear that his comments could be construed as sexual harassment,
and complained to his co-workers and superiors that he found the
activity offensive. He was also called into a meeting with his
superiors where they asked why he did not participate in
conversations in the office. After he complained to them, he was
given a series of tests and eventually fired. The complaint
sufficiently alleges that he found the behavior and conversations
subjectively offensive.

Taking the allegations as true, a reasonable jury might
conclude that his co-workers went beyond simple teasing and
occasional remarks. Further, following his complaint, the
plaintiff faced workplace consequences and was fired within a few
weeks.[9] The plaintiff did not, however, experience physical
threats, nor was the conduct especially severe. But the Fifth
Circuit has found that a hostile work environment could exist even
if the offensive conduct was verbal, non-threatening, or only

_____

[9] The plaintiff began work in the radio room on June 22, 2016 and
was terminated six weeks later on August 9, 2016. It is not clear
from the complaint when he spoke to Lieutenant Toups and Sergeant
Popper about the sexual harassment, but it was no later than mid-
July.

lasted a few days, as long as it was pervasive. See Farpella-Crosby v. Horizon Health Care, 97 F.3d 803, 805 (5th Cir. 1996) (upholding a district court's denial of the plaintiff's employer's motions for judgment as a matter of law after a jury found the employer liable for a hostile work environment when the plaintiff's supervisor frequently commented and inquired about the plaintiff's sexual life); Royal, 736 F.3d at 398 (holding that there was a genuine dispute of material fact of whether the plaintiff experienced workplace sexual harassment when she was fired for unspecific reasons after complaining that two coworkers visited her small office several times in the four-day period she worked there, hovered over her, and sniffed her in a sexually suggestive manner). Accordingly, the complaint makes sufficient allegations to state a Title VII sexual harassment claim that survives the pleading stage.

Additionally, Richard claims that the defendant retaliated against him when he complained of the sexual harassment, in violation of Title VII. The defendant contends that to establish a prima facie case of retaliation under Title VII, the plaintiff must show "(1) that [he] engaged in activity protected by Title VII; (2) that an adverse employment action occurred; and (3) that there was a causal connection between the participation in the protected activity and the adverse employment decision." Flagship Int'l, 793 F.2d at 724. Although the defendant properly identified

the "framework that governs the standard of proof at trial, 'a plaintiff need not make out a prima facie case of discrimination in order to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim.'" Stone v. Louisiana Dept. of Revenue, 590 Fed.Appx. 332, 339 (5th Cir. 2014) (quoting Raj v. Louisiana State University, 714 F.3d 322, 331 (5th Cir. 2013). Instead Richard is only required to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," id. (quoting Iqbal, 556 U.S. at 678), which includes "alleg[ing] facts sufficient to state all the elements of h[is] claim." Id. (quoting Mitchell v. Crescent River Port Pilots Ass'n, 265 Fed.Appx. 363, 370 (5th Cir. 2008)). The plaintiff has done so.

"To state a claim for retaliation in violation of Title VII, the plaintiff must allege that her employer took an adverse employment action against her in retaliation for engaging in protected conduct." Stone, 590 Fed.Appx. at 339. An employee has engaged in a protected conduct if he opposed any practice that Title VII makes unlawful. Royal, 736 F.3d at 401. The plaintiff must only have a "reasonable belief" that the practice is unlawful. Id. at 401 n.2 (quoting Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130, 1140 (5th Cir. 1981)). Taking the allegations in the complaint as true, Richard has sufficiently alleged retaliation under Title VII to survive a motion to dismiss.

He alleged sufficient facts to show that he engaged in a protected activity by alerting his superior of the frequent sexual harassment he experienced in the radio room and stating that he would like to make a complaint. Additionally, when he reported the harassment, one of the alleged perpetrators, Sergeant Amy Poppler, was present and informed Richard that she would inform his co-workers in the radio room of Richard's complaint. Immediately, he was assigned to a new trainer, Corporal Brittany Harbin, another of his alleged harassers, who immediately required him to take frequent and unannounced typing and writing quizzes. Over the subsequent several weeks, his co-workers ceased speaking to him. About six weeks after his transfer into the Radio Room and three weeks after he complained of the harassment to Lieutenant Toups and Sergeant Popper, he was terminated from the Sherriff's Department "due to [Richard's] struggling in the Radio Room." The response of his co-workers and superiors, the immediate administration of tests, and the justification for termination—that he was struggling even though he had reported harassment—pleads a plausible causal connection.

B.

In Count III, the plaintiff alleges that the defendant discriminated against him because of his finger injury, in violation of the American with Disabilities Act. The ADA prohibits employers from discriminating against an employee on the basis of

disability if the employee could perform the essential functions of the job, or reasonable accommodations would allow him to perform the essential functions. 42 U.S.C. §§ 12111-12; <u>Cannon v. Jacobs Field Services North America, Inc.</u>, 813 F.3d 586, 591, 592 (5th Cir. 2016). A plaintiff states a claim for relief if he alleges that: "(1) he has a disability . . . (2) that he was qualified for the job; and (3) he was subject to an adverse employment decision on account of his disability." <u>Cannon</u>, 813 F.3d at 590.

The ADA defines "disability" as: (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual;"[10] (2) "a record of such an impairment; or" (3) "being regarded as having such an impairment." 41 U.S.C. § 12102. First, to determine whether a plaintiff's impairment substantially limited a major life activity, courts consider "(1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) its permanent or expected permanent or long-term impact." <u>Pryor v. Trane Co.</u>, 138 F.3d 1024, 1026 (5th Cir. 1998). The Fifth Circuit has held that impairments like carpel tunnel syndrome that may prevent an employee from performing a particular job does not constitute a substantial

---

[10] The ADA provides that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."

limitation of a major life activity. <u>Moreno v. Brownlee</u>, 85 Fed.Appx. 23, 27 (5th Cir. 2004)(unpublished). Following this Circuit's precedent, Richard's broken pinky finger does not substantially limit any major life activities. His injury is not permanent. Richard did not work for eleven weeks following the break and experienced nerve damage, but his doctor subsequently released him to return to work and he regained use of his hand, including his pinky. His injury precludes him from typing quickly for long periods of time, but that limitation is not sufficient to establish a disability under the ADA, according to the case literature. Richard has alleged no facts that elevate his injury from mere temporary inconvenience to a life-disrupting disability.

C.

In Counts IV and V, Richard alleges that the defendant violated the Age Discrimination in Employment Act by creating a hostile work environment and retaliating against the plaintiff for making age-based complaints. Richard contends that Deputy Penton frequently made offensive ageist comments towards Richard, with the full knowledge of Corporal Holloway and Chief Oswald. He contends that his complaints of the ageist work environmental was the sole reason Chief Oswald took away Richard's ticket-writing privileges and demoted him to the Radio Room.

The ADEA prohibits an employer from taking adverse action against its employee because of the employee's age. <u>Gross v. FBL</u>

Fin. Servs., Inc., 557 U.S. 167, 170 (2009); 29 U.S.C. § 623(a). It also creates a cause of action for hostile work environments based on age discrimination. Dediol v. Best Chevrolet, Inc., 655 F.3d 435, 441 (5th Cir. 2011). To establish a prima facie case of discriminatory treatment based on age, the claimant must prove "that (1) he was over the age of 40; (2) the employee was subjected to harassment, either through words or actions, based on age; (3) the nature of the harassment was such that it created an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer." Id. A work environment is hostile if is it "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently pervasive to alter the conditions of the victim's employment" and both objectively and subjectively offense. Id. (quoting Alaniz v. Zamora-Quezada, 591 F.3d 761, 771 (5th Cir. 2009)). To evaluate whether conduct is objectively offensive, courts consider: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance." Id. (quoting EEOC v. WC&M Enters., 496 F.3d 393, 399 (5th Cir. 2007)). The Fifth Circuit has held that repeated profane references to the claimant's age within the work setting could amount to a hostile work environment claim. Id. at 443-444. However, a plaintiff need not

23

allege a prima facie case to state a plausible age discrimination claim. <u>Haskett v. Continental Land Resources, L.L.C.</u>, 668 Fed. Appx. 133, 134 (5th Cir. 2016)(unpublished). Nonetheless, the consideration of the elements is helpful in determining whether the plaintiff met the plausibility standard. <u>Id.</u>

Richard is over forty years old. He alleges that Deputy Penton "constantly" made age-based derogatory comments, such as calling him an "old man" and asking if he "can still get it up." The comments were made privately and also in front of co-workers and members of the public. He alleges that he reported the comments to his superior, but Penton did not relent, and mocked him for threatening to report him again. Richard alleges that the vulgar comments occurred with regularity, and although he was not physically threatened, he was humiliated. The plaintiff has alleged sufficient facts for the Court to reasonably infer that he could have experienced a hostile work environment because of the age-based comments.

Richard also contends that the defendant retaliated against him for complaining of the ageist comments. To establish a prima facie retaliation claim under the ADEA, the claimant must show "(1) that he engaged in a protected activity, (2) that there was an adverse employment action, . . . (3) that a causal link existed between the protected activity and the adverse employment action" and (4) that he was qualified to hold the position. <u>Wooten v.</u>

McDonald Transit Ass'n. Inc., 788 F.3d 490, 496-497 (5th Cir. 2015). Again, consideration of the prima facie framework is helpful, but not determinative, in assessing whether Richard pled a plausible cause of action.

Richard alleges that he reported Penton's ageist comments to Corporal Holloway. Holloway and Penton are close personal friends, and instead of correcting Penton's conduct, he informed Chief Deputy Oswald that Penton was making baseless claims. Shortly thereafter, Oswald ordered Lieutenant Wicker to suspend Richard's ticket writing privileges, but gave no reason. Wicker told the plaintiff that he was the best field deputy on the staff, that he believed Oswald's actions were "wrong and illegal," and that Oswald appeared to be "hunting" the plaintiff. Richard also alleges that his demotion from patrol to the radio room after the incident on Million Dollar Road was solely because he complained of the hostile work environment. The plaintiff claims that his complaint, a protected activity, was the sole reason he experienced adverse employment actions, specifically the loss of his ticket writing privileges and his demotion, which resulted in a salary reduction of $10,000. His allegations that he was immediately punished shortly after he made his complaint is sufficient to support a pleading that a causal connection is plausible. Richard's claims survive the pleading stage.

Accordingly, IT IS ORDERED: that the defendant's motion to dismiss is GRANTED as to Count III, pertaining to the ADA, and DENIED as to Counts I and II, pertaining to sexual harassment under Title VII, and Counts IV and V, pertaining to the ADEA.

New Orleans, Louisiana, May 2, 2018

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE