UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MARK RICHARD                                    CIVIL ACTION

V.                                              NO. 17-9703

ST. TAMMANY PARISH SHERIFF'S                    SECTION "F"
DEPARTMENT


ORDER AND REASONS

Before the Court is the defendant's motion for summary
judgment.  For the reasons that follow, the motion is DENIED.

**Background**

Mark Richard graduated from the St. Tammany Parish Sheriff's
Office Police Academy in August of 2013 and began working as a
deputy in the criminal patrol division shortly thereafter.

He alleges that beginning in the fall of 2015, his coworker,
Deputy Patrick Penton, repeatedly made derogatory comments
concerning Richard's age.  Richard was forty-nine years old at the
time.  Penton would call him an "old man," ask if he could "still
get it up," and make other similar comments in front of their
colleagues and in public.[1]  Richard asked Penton to stop making

---

[1] During his deposition, Mr. Richard testified as follows
concerning Deputy Penton's ageist comments:
> [L]ike I said in my original report, I can take a joke.
> But it was in front of calls for service.  We'd be in
> front of somebody just got beat up by their husband and
> then he'd start saying, "Yeah.  Well, this cop right
> here can't get it up no more because he ain't taking his
> Geritol," or something ridiculous . . . [I]t became a

1

the comments and complained to his superior, Corporal Tony Holloway, but Penton did not relent.  On February 3, 2016, shortly after making the complaint, two of Richard's superiors, Lieutenant Wayne Wicker and Corporal Tony Holloway, notified Richard that his ticket-writing privileges would be suspended until March 1, 2016. They informed Richard that they disagreed with the decision but that they were under orders from Chief Fred Oswald.

On March 17, 2016, Richard asked Penton to join him for dinner.  There, Richard expressed that he found the derogatory age-based comments embarrassing and unprofessional and asked Penton to stop making them, especially when they were on calls in front of civilians.  Penton continued to taunt Richard at dinner, asking "What are you going to do? Report me?"  When Richard answered in the affirmative, Penton dismissed the threat, stating that he was close friends with their superior, Corporal Holloway.

Later that night, Richard was patrolling on Million Dollar Road when he pulled over to speak with a young man he observed walking alone on the street.  The young man advised that bright lights caused him to have seizures, so Richard turned off the vehicle's forward-facing emergency lights but left on the rear-facing overhead lights.  While obtaining the man's personal information, Richard heard a vehicle screech and speed onto the

real disruption to the job.  And doing it in front of victims, calls for service, very unprofessional.

road, despite the 15-mph speed limit.  The vehicle momentarily slowed and then accelerated towards Richard and skidded right past him, nearly running him over.  Richard promptly contacted dispatch to report what had occurred.

When the driver braked and exited her vehicle, Richard immediately recognized her as Michaela Rodosta, a young woman he had previously encountered while in the field.  During one incident, he pulled over a car in which she was riding, smelled marijuana, and arrested the driver (who claimed possession of the contraband); on another occasion, Richard was called to enforce a court order against Rodosta, which required him to physically remove her three-year-old daughter from her custody.  Richard also was aware that Rodosta had recently posted pictures on social media which advertised that she was selling marijuana out of her trunk. Within minutes of Richard's call, Deputy Penton and Corporal Holloway arrived and spoke with Rodosta, who claimed that she did not see Richard because his lights were not illuminated; they quickly dismissed her from the scene.

On March 21, 2016, the following Monday, Lieutenant Wayne Wicker called Richard into his office to discuss the incident at Million Dollar Road.  Although Richard vehemently claimed that his lights were on, Deputy Penton and Corporal Holloway reported that they believed Rodosta's account that his lights were off.  Richard gave Lieutenant Wicker a written statement of the incident and of

the disagreement he had with Deputy Penton earlier that evening. He also stated that he wanted to make a complaint about the age-based harassment. Lieutenant Wicker assured Richard that he would see about making a report. To Richard's knowledge, no report was ever made.

That same day, Lieutenant Wicker met with Corporal Holloway and ordered him to obtain statements from all witnesses to the Million Dollar Road incident. After reviewing statements from Mr. Richard, Corporal Holloway, Deputy Penton, Michaela Rodosta, and Kile Mclain (the suspect Richard was investigating that night), Wicker determined that Richard had parked his vehicle in the middle of the roadway in the dark with no emergency lights on. He concluded that such conduct amounted to a Group 3 safety violation.

A few weeks later, on March 31, 2016, Richard slammed his hand in a car door while on a call for duty, causing an open break of a right-hand finger. He was treated at the St. Tammany Hospital emergency room and sent home on medical leave. Richard was out of work for eleven weeks because the injury caused nerve damage and required physical therapy. While on leave, Richard was contacted by Human Resources on April 7, 2016 concerning the Million Dollar Road incident that had occurred the previous month. He was advised that, because he had failed to turn on his emergency lights, he was being demoted from road patrol and transferred to

the communications division to serve as a dispatcher; it was also noted that his annual pay would be reduced by nearly $10,000.

Richard promptly requested an administrative review of his demotion. In accordance with his request, an Administrative Review Board was convened on May 9, 2016. After considering testimony and reviewing evidence, the ARB affirmed Richard's transfer from patrol to communications. Although Richard provided Lieutenant Wicker with photos Ms. Radosta had posted on social media, in which she appeared to be holding marijuana, such evidence was not considered by the ARB.

Richard returned from medical leave on June 21, 2016 and reported to the Radio Room for his introductory period in the communications division.[2] Despite still wearing a splint on his finger and suffering from extensive nerve damage, Richard was required to type continuously during his 12-hour shifts. Working with eight females and one young male, Richard claims he was also exposed to sexually explicit conversations and conduct by his Radio Room co-workers. Richard testified during his deposition that, beginning with his first shift in the Radio Room, "it was like Girls Gone Wild episodes, every single one." He explained that female dispatchers, including his immediate rank, Sergeant Amy

---

[2] In accordance with STPSO policy, the introductory period in each department is twelve months for new hires and six months for existing employees, like Mr. Richard, who transfer to a new department.

Poppler and Corporal Brittany Harbin, would "talk[] about sexual stuff, sexual positions, oral sex techniques" and "pass[] a ruler around showing penis sizes they preferred."  Richard further asserts that, on at least four occasions, Sergeant Poppler performed what she called her "sexy dance:"

> She would pop her breasts out the top of her shirt
> pinching her nipples and squat and then she would jiggle
> her breasts -- and she would do it right in front of me
> -- and wiggle her ass back and forth in front of me in
> this little dance where she shuffled like MC Hammer.[3]

Richard complained of this behavior, calling it "unprofessional" and "offensive."  After his first week of training, Richard met with Sergeant Poppler, Corporal Harbin, and Miranda Mobley, his field training officer ("FTO") for Phase 1 of the introductory period.  They advised Richard that he had been caught falling asleep during two of his shifts; he left that meeting with a warning.  About three weeks later, on July 18, 2016,

---

[3] Sergeant Poppler admitted during her deposition that she danced in the Radio Room on multiple occasions, although she denied that the dance was "sexy:"
> **Q:** Okay.  Did you ever do what I believe you called a
> "sexy dance"?
> **A:** I never --
> **Q:** Are you familiar with them?
> **A:** I never did a sexy -- what they would call a sexy
> dance.
> **Q:** Okay.
> **A:** Did I dance?  Yes, but not in a sexual manner, no. .
> . .
> **Q:** Okay.  So you never shook your butt back and forth?
> **A:** It was -- we were laughing on if I had rhythm or not,
> and I had no rhythm, but it was not in a sexual manner
> or anything like that, no.

Richard was called into Lieutenant Toups's office with Sergeant Poppler. They stated that Richard was struggling in the Radio Room and asked why he did not participate in workplace conversations. Richard explained that the constant typing irritated his hand injury and caused a shooting pain in his arm; he also noted that FTO Mobley was being too hard on him. He added that he carefully avoided the conversations because his participation could easily be construed as sexually offensive; he also stated that he wished to make a formal complaint of the harassment. Sergeant Poppler allegedly replied that they were not used to having men in the Radio Room and that she would talk with the others about his complaint.

When Richard returned to his desk, he was immediately reassigned to Corporal Harbin for the remainder of his Phase 1 training. The next morning, on July 19, 2016, Corporal Harbin instructed Richard to take a typing test. Because the STPSO uses Computer Aided Dispatch to process 911 calls, it is critical for dispatchers in the communications division to be competent typists.[4] Therefore, typing tests are administered to applicants

---

[4] Captain Donna Schlesinger, STPSO's Director of Human Resources, testified during her deposition that most deputies assigned to the communications division work as dispatchers but that at least one position does not require the same level of typing prowess as is required for dispatchers:

> **Q:** Okay. Of the job, the various jobs in the radio room that you can think of right now, can you think of any that do not involve typing?

before they begin their duties in the Radio Room.[5] Richard attempted the test twice. Typing 21 and 22 words-per-minute, respectively, he failed to meet the 25-word-per-minute "cutoff score." Harbin also administered unannounced, written exams, all of which Mr. Richard successfully completed. For the three weeks following his meeting with Lieutenant Toups and Sergeant Poppler, no one would speak to Richard, and the workplace environment became increasingly hostile.

After completing his first six weeks of training, Richard was assigned to train with Officer Smith for Phase 2 of the introductory period. When he arrived to work for his first day as a Phase 2 trainee, Richard was advised that he could leave early because Human Resources needed to see him the next morning. On August 9, 2016, Richard reported to Human Resources, where Major Doug Sharp stated that he was terminated "due to [his] struggling in the Radio Room." Richard asked Major Sharp why he was being fired when he had passed all of his written exams but was told that Chief Oswald had made the decision.

---

**A:** Oh, gosh. I can't think of what the person who runs NCIC, I can't think of -- she has to type, but she doesn't have to type, she wouldn't have to type at a certain rate of speed.

[5] Although Lieutenant Toups and Corporal Harbin attest in their affidavits that "Richard had not taken the entrance typing test that all applicants must take before being hired for the communications division," neither affiant explains why the test was administered three weeks after he began working in the Radio Room.

However, Major Doug Sharp attests in his affidavit that *he* made the decision to terminate Richard's employment:

> On August 9, 2016, I determined that Mark Richard had not met the standards to continue with any training provided by the STPSO considering Mark Richard was in his introductory period with the communications division and had not demonstrated that he could perform the essential requirements of his job duties, as documented by Lt. Brandy Toups.

Major Sharp attaches to his affidavit the Employee Counseling Form issued in connection with Richard's termination, which provides that Richard was discharged because he "ha[d] not demonstrated that he c[ould] perform the essential requirements of his job duties required to be a Deputy in Communications;" Richard's sleeping on duty, difficulty accepting criticism, and inadequate typing speed were specifically identified as "issues."[6] But, according to an End of Phase Evaluation form dated August 7, 2016, Corporal Harbin recommended that "Richard move on to the radio phase of training," but continue "to practice typing and [] continue to work on his speed of entry of calls." This form was ostensibly signed by Lieutenant Toups on August 8, 2016.

---

[6] The Employee Counseling Form notes that "the following issues ha[d] occurred" during Richard's first four weeks of training: (1) Richard received a verbal warning on June 29, 2016 after he was observed falling asleep during his shifts on June 24 and 25; (2) he "began to have issues accepting constructive criticism regarding his training" on July 9, 2016; (3) he "became argumentative and began denying errors that he had made" on July 13, 2016; and (4) he failed the CritiCall Keyboarding test twice on July 19, 2016.

Richard submitted an intake questionnaire to the EEOC on August 24, 2016 and filed a charge of discrimination on June 20, 2017, asserting that he was subjected to an ageist and sexually hostile work environment and retaliated against each time he complained to his superiors.  The EEOC issued a right to sue letter on July 5, 2017.

The following month, on September 27, 2017, Mark Richard sued the St. Tammany Parish Sheriff's Department, contending that the defendant: (1) subjected him to a sexually hostile work environment, in violation of Title VII of the Civil Rights Act; (2) terminated his employment in retaliation for his complaints of a sexually hostile work environment, in violation of Title VII; (3) subjected him to age-based harassment, in violation of the Age Discrimination in Employment Act; and (4) retaliated against him for his complaints of an ageist hostile work environment, in violation of the Age Discrimination in Employment Act; he also alleged a violation of the Americans with Disabilities Act.

Sheriff Randy Smith moved to dismiss the complaint, contending that the sheriff's department is not an entity capable of being sued; Richard amended his complaint to name Sheriff Smith as the sole defendant, rendering the motion to dismiss moot. Sheriff Smith then moved to dismiss the amended complaint for failure to state a claim.  In its Order and Reasons dated May 3, 2018, this Court granted the motion to dismiss, in part, as to the

ADA claim, and denied the motion, in part, as to the sexual harassment and retaliation claims under Title VII, as well as to the age-based harassment and retaliation claims under the ADEA. Sheriff Smith now moves for summary judgment, contending that no genuine issue of material fact exists concerning the failure of Richard's remaining claims.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. Id. Hearsay evidence and

11

unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2). "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007) (internal quotation marks and citation omitted). Ultimately, "[i]f the evidence is merely colorable . . . or is not significantly probative," summary judgment is appropriate. Anderson, 477 U.S. at 249 (citations omitted); King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) ("Unauthenticated documents are improper as summary judgment evidence.").

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d

824, 830 (5th Cir. 2013) (internal quotation marks and citation omitted).

II.

In Counts I and II of his complaint, the plaintiff alleges violations of Title VII of the Civil Rights Act. Specifically, Richard claims that he was subjected to a sexually hostile work environment in the Radio Room and then fired in retaliation for reporting the harassment.

*A.*

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment claims are actionable under this provision in two circumstances: (1) "[w]hen . . . a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands" (often referred to as a *quid pro quo* claim); and (2) if there is "severe or pervasive" sexual harassment creating a hostile work environment. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 753-54 (1998).

To establish a hostile work environment claim, a plaintiff must prove that: (1) he belongs to a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on

13

sex; (4) the harassment affected a "term, condition, or privilege of employment;" and (5) his employer knew or should have known of the harassment and failed to take prompt, remedial action. Hernandez v. Yellow Transp. Inc., 670 F.3d 644, 651 (5th Cir. 2012).

A hostile work environment claim is only actionable if the harassment is "so 'severe or pervasive' as to 'alter the conditions of the victim's employment and create an abusive work environment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (quoting Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). In evaluating whether a workplace is sufficiently hostile, courts consider the totality of the circumstances, including the frequency and severity of the conduct, "whether it is physically threatening or humiliating," and "whether it unreasonably interferes with the employee's work performance." Id. at 787-88 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993)). "[S]imple teasing" and occasional remarks are not actionable; Title VII is not a "general civility code." Id. (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998)). Nonetheless, a claim may be actionable despite a lack of physical contact. Royal v. CCC&R Tres Arboles, L.L.C., 736 F.3d 396, 403 (5th Cir. 2013). For Richard's claim to be actionable, his work environment must have been "both objectively and subjectively offensive, one that a reasonable person would

find hostile or abusive, and one that [he] in fact did perceive to be so." Faragher, 524 U.S. at 787.

The defendant challenges Richard's ability to establish the fourth element of his prima facie hostile work environment claim. To satisfy the fourth element -- whether the harassment affected a term or condition of employment -- it "must be sufficiently severe *or* pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor Sav. Bank, FSB v. Vinson, 477 U.S. at 67 (emphasis added).[7]

Richard relies on several incidents of harassing conduct. He submits that his co-workers and superiors used vulgar and sexually explicit language during every shift in the Radio Room; they discussed oral sex techniques, debated sexual positions, and passed a ruler to every operator to inquire as to their preferred penis size. Additionally, on four occasions, the plaintiff's

---

[7] Notably, the Fifth Circuit has recognized that:
> [a]n egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment. The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of pervasive, thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists. Thus, the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct.

Lauderdale v. Tex. Dep't of Crim. Justice, 512 F.3d 157, 163 (5th Cir. 2007).

immediate rank, Sergeant Amy Poppler, performed a "sexy dance" where she "would pop her breasts out the top of her shirt . . . right in front of [Mr. Richard] -- and wiggle her [butt] back and forth in front of [him]."[8]

To survive summary judgment, the harassment must be "so severe [or] pervasive that it destroys a protected classmember's opportunity to succeed in the workplace." Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 874 (5th Cir. 1999). "The alleged conduct must be more than rude or offensive comments, teasing, or isolated incidents." Hockman v. Westward Communications, LLC, 407 F.3d 317 (5th Cir. 2004) (citing Shepherd, 168 F.3d at 874).

The defendant contends that, although Mr. Richard may have found the conversations and "dance" to be subjectively offensive, the conduct was not objectively offensive because it did not interfere with the performance of his work or involve inappropriate physical contact. The record reflects that Richard did not participate in the conversations out of fear that his comments

---

[8] Although the defendant offers the affidavit of Corporal Brittany Harbin, in which she attests that "at no point did Amy Poppler ever perform a 'sexy dance' by 'squeez[ing] her breasts together and wiggl[ing] her butt across the office'" and "at no point from June 21, 2016 through August 9, 2016 did [Harbin], or any others in the communications division, discuss 'penis sizes . . ., oral sex techniques, and positions in which [dispatchers] liked to have sex," or "pass a ruler around the room in order to indicate a preferred length of penis size," Richard's deposition and the Harbin affidavit clearly impact material disputed issues of fact that make summary relief inappropriate.

could be construed as sexual harassment and that he complained to his co-workers and superiors that he found the activity offensive. He also was called into a meeting with his superiors where they asked, among other things, why he did not participate in conversations in the office.

Richard further testified that the dispatchers engaged in sexually explicit discussions during "every single one" of his shifts in the Radio Room. Although the conversations were not physically threatening, the record reflects that they were frequent and continued despite Richard's protests that they were inappropriate. Indeed, on one occasion when Richard requested that his co-workers stop discussing their preferred sexual positions and techniques, one of the perpetrators retorted: "[I]f I was a girl surrounded by guys talking like this, I'd sue the f*** out of this department in federal court. But since you're a guy and we're girls, we can do it. It's okay."

On this record, the dispatchers' alleged relentless discussions about sex, coupled with Sergeant Poppler's "sexy dance" in which she exposed her breasts, rise to the level of severity or pervasiveness necessary to maintain a hostile work environment claim under the law. See Farpella-Crosby v. Horizon Health Care, 97 F.3d 803, 805 (5th Cir. 1996) (upholding district court's denial of employer's motion for judgment as a matter of law where the plaintiff's supervisor frequently commented and

inquired about the plaintiff's sexual life); <u>Royal</u>, 736 F.3d at
398 (finding a genuine dispute of material fact as to whether the
plaintiff experienced sexual harassment when she was fired for
unspecific reasons after complaining that two coworkers visited
her small office several times in the four-day period she worked
there, hovered over her, and sniffed her in a sexually suggestive
manner).

The defendant next submits that Richard cannot establish the
final element of his prima facie harassment claim – that the STPSO
knew or should have known of the harassment yet failed to take
prompt, remedial action. Although Richard testified during his
deposition that Sergeant Poppler's "dance" ceased after he
complained to Lieutenant Toups on July 18, 2016, he also testified
that he was immediately ostracized by his co-workers following his
complaint and subjected to unannounced typing tests and written
exams. Because a genuine factual dispute exists as to whether
Lieutenant Toups took prompt and appropriate remedial action,
summary dismissal of Richard's Title VII hostile work environment
claim is inappropriate.

*B.*

Richard also complains that the defendant retaliated against
him when he complained of the sexual harassment, in violation of
Title VII.

Like employment discrimination claims, retaliation claims under Title VII are governed by the McDonnell Douglas burden-shifting framework. See LeMaire v. La. Dep't of Transp. & Dev., 480 F.3d 383, 388 (5th Cir. 2007) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). Under that framework, an employee must first establish a prima facie case of retaliation by showing that: (1) he engaged in a protected activity; (2) his employer took action that a reasonable employee would have found "materially adverse;" and (3) a causal link exists between the protected activity and the adverse action. Burlington N. & Santa Fe. Ry. Co. v. White, 548 U.S. 53, 68 (2006); McCoy v. City of Shreveport, 492 F.3d 551, 556-57 (5th Cir. 2007). If the employee makes such a showing, the familiar burden-shifting framework identified above applies: the employer must articulate legitimate, non-discriminatory reasons for its employment action and then, if articulated, the burden shifts back to the employee to show that the employer's proffered reasons are a pretext for its actual retaliatory purpose. See id.

Under Title VII, "[a]n employee has engaged in protected activity when []he has (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing' under Title VII." Douglas v. DynMcDermott Petroleum Operations Co., 144 F.3d 364, 372-73 (5th Cir. 1998)

(quoting 42 U.S.C. § 2000e-3(a)).  To satisfy the opposition

requirement,[9] the plaintiff "need not prove that the conduct []he

opposed rose to the level of a Title VII violation, but []he must

at least show a reasonable belief that it did." Taliaferro v.

Lone Star Implementation & Electric Corp., 693 F. App'x 307, 310

(5th Cir. 2017) (per curiam) (quoting E.E.O.C. v. Rite Way Serv.,

Inc., 819 F.3d 235, 237 (5th Cir. 2016)).

It is undisputed that Richard engaged in protected activity

on July 18, 2016 when he complained to his superior, Lieutenant

Toups, about the sexually explicit conduct to which he had been

subjected in the Radio Room.  The defendant also does not dispute

that Richard suffered a materially adverse action when his

employment was terminated on August 9, 2016.  Rather, the defendant

submits that Richard can neither establish the causation element

of his prima facie case, nor rebut the defendant's proffered reason

for his termination.

"Title VII retaliation claims require proof that the desire

to retaliate was the but-for cause of the challenged employment

action." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352

(2013).  In determining the existence of a causal link, courts

---

[9] Because Richard did not file his EEOC charge or otherwise
participate in any proceeding under Title VII until after the
alleged retaliatory employment action occurred, the participation
clause cannot form the basis of his retaliation claim.  See 42
U.S.C. § 2000e-3(a).

have considered three factors: (1) "the employee's past disciplinary record;" (2) "whether the employer followed its typical policy and procedures in terminating the employee;" and (3) "the temporal relationship between the employee's conduct and discharge." See Nowlin v. Resolution Trust Corp., 33 F.3d 498, 508 (5th Cir. 1994) (noting that "[t]his analysis is highly fact specific").

Although it is not factually disputed that Richard met with his superiors on two occasions regarding disciplinary issues that arose shortly after he began working in the Radio Room, it is not entirely clear from the record that STPSO followed its policies and procedures in administering a typing exam to Richard nearly one month after he began working in the Radio Room. While Lieutenant Toups and Corporal Harbin attest in their affidavits that "Richard had not taken the entrance typing test that all applicants must take before being hired for the communications division," neither affiant explains why the test was administered three weeks after he began working in the Radio Room.

Similarly, Sergeant Poppler confirmed during her deposition that typing tests are administered to Radio Room employees prior to the commencement of their duties and that she did not know why Richard was not tested in conformity with that policy:

> **Q:** . . . You, basically, told me what testing was done when somebody comes into the radio room, and I think you said the first thing is CritiCall, and that's the typing.

21

**A:** Yes, sir.

**Q:** Okay.  And, for whatever, reason, that did not happen in Mr. Richard's case.
**A:** Yes, sir.

**Q:** Okay.  And you don't know why?
**A:** No, sir.

Moreover, the record reveals that Richard was terminated only three weeks after he lodged his July 18 complaint with Lieutenant Toups. STPSO's failure to comply with its policies, coupled with the close proximity in time between Richard's protected activity and termination, are sufficient to support his prima facie case of unlawful retaliation.  See Stephens v. Bd. of Supervisors, No. 16-6885, U.S. Dist. LEXIS 211800, at *13 (E.D. La. Dec. 27, 2017) ("In cases with '[c]lose timing between an employee's protected activity and an adverse action against [her],' a plaintiff may satisfy the causation requirement of her *prima facie* case through the evidence of proximity alone.") (citations omitted).

Finally, genuine factual disputes exist concerning whether the defendant's proffered reason for terminating Richard's employment – his "struggling in the Radio Room" - is pretext for retaliation.  To prove pretext, "the plaintiff must rebut each . . . nonretaliatory reason articulated by the employer."  McCoy, 492 F.3d at 557.  Stated differently, "[a]n employee establishes pretext by showing that the adverse action would not have occurred but for the employer's retaliatory reason for the action."

<u>Rodriguez v. Brownsville Indep. Sch. Dist.</u>, 739 F. App'x 227, 231 (5th Cir. 2018) (per curiam) (unpublished) (citing <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 570 U.S. 338, 360 (2013)). Thus, to survive summary judgment, "the plaintiff must show a conflict in substantial evidence on the question of whether the employer would not have taken the action but for the protected activity." <u>Id.</u> (quotations omitted).

Sheriff Smith submits that Richard was terminated for his "failure to meet the requirements of the communications division position and his accompanying job performance issues." For support, the defendant points to the affidavit of Major Doug Sharp, in which he attests that Richard was terminated because he "had not demonstrated that he could perform the essential requirements of his job duties, as documented by Lt. Brandy Toups." Major Sharp also attaches to his affidavit the Employee Counseling Forming issued in connection with Richard's termination, which identifies Richard's sleeping on duty, difficulty accepting criticism, and inadequate typing speed as "issues."[10]

---

[10] Specifically, the Employee Counseling Form provides that "the following issues [] occurred" during Richard's first four weeks of training: (1) Richard received a verbal warning on June 29, 2016 after he was observed falling asleep during his shifts on June 24 and 25; (2) he "began to have issues accepting constructive criticism regarding his training" on July 9, 2016; (3) he "became argumentative and began denying errors that he had made" on July 13, 2016; and (4) he failed the CritiCall Keyboarding test twice on July 19, 2016.

In response, Richard first presents evidence to demonstrate the defendant's retaliatory animus.  Pointing to his own deposition testimony for support, Richard submits that, immediately after lodging his sexual harassment complaint with Lieutenant Toups on July 18, 2016, he was ostracized by his co-workers in the Radio Room.  He also was assigned a new trainer, Brittany Harbin, another one of his alleged harassers, who immediately required him to take an unannounced typing test.

Richard also points to evidence that raises serious disputed fact questions about the defendant's proffered reasons for his discharge.  According to the affidavit of Major Doug Sharp, Richard was terminated because he "had not demonstrated that he could perform the essential requirements of his job duties, **as documented by Lt. Brandy Toups**." (emphasis added).  However, according to an End of Phase Evaluation form dated August 7, 2016, Corporal Harbin recommended that "Richard move on to the radio phase of training," but continue "to practice typing and [ ] continue to work on his speed of entry of calls."  The form, which was ostensibly signed by Lieutenant Toups on August 8, 2016, explicitly states in bold print that "trainee is recommended for: advancement," as opposed to "extension" or "termination."  And notably absent from the form is any reference to Richard's sleeping on the job or his difficulty accepting criticism.

Aside from the End of Phase Evaluation Form, Richard presents additional evidence to suggest that his typing speed was not truly a factor in his termination. Corporal Harbin and Lieutenant Toups attest in their affidavits that "[t]he ability to type faster than 25 words per minute is a requirement for communications division deputies." However, Captain Schlesinger recognized during her deposition that at least one position in the communications division does not require the level of typing prowess that is required for dispatchers:

> **Q:** Okay. Of the job, the various jobs in the radio room that you can think of right now, can you think of any that do not involve typing?
>
> **A:** Oh, gosh. I can't think of what the person who runs NCIC, I can't think of -- she has to type, but she doesn't have to type, she wouldn't have to type at a certain rate of speed.

Additionally, Sergeant Poppler confirmed during her deposition that successfully passing the typing test is a prerequisite to commencing work in the Radio Room and that she had no idea as to why Richard was not tested until nearly a month after he began working in the Radio Room:

> **Q:** We talked about the new hire and the transfer situation. You, basically, told me what testing was done when somebody comes into the radio room, and I think you said the first thing is CritiCall, and that's the typing?
> **A:** Yes, sir.
>
> **Q:** Okay. And, for whatever reason, that did not happen in Mr. Richard's case?
> **A:** Yes, sir.

**Q:** Okay.  And you don't know why?
**A:** No, sir.

                    . . .

**Q:** Okay.  The next line (as read), "Day 13, July 19, 2016," so this is the day after the meeting, it says (as read), "Deputy Richard was given the CritiCall keyboarding tests."  That's the typing tests; right?
**A:** Yes, sir.

**Q:** Okay.  And that's the one you told me that, in your experience, everybody gets that test the first.  It's the first thing that they're given; right?
**A:** Yes, sir.

**Q:** Okay.  And you don't know why he didn't get one when he started on his first day?
**A:** No, sir.

**Q:** Do you know why he's getting one on day 13?
**A:** I -- I don't know.

Sergeant Poppler also could not explain why Richard was permitted to continue working in the Radio Room for three weeks after failing a typing test that was purportedly a pre-requisite to serving as a dispatcher in the Radio Room:

**Q:** . . . Do you know why he wasn't fired immediately when he failed the typing test?
**A:** I couldn't tell you.

                    . . .

**Q:** Do you know why he was allowed to work for three more weeks before he was terminated?
**A:** I don't know that answer?

**Q:** Okay.  Do you know why he was never retested on his typing?
**A:** No, sir.

Finally, the record is unclear as to who made the decision to terminate Mr. Richard's employment.  Captain Schlesinger, STPSO's Director of Human Resources, testified during her deposition that

she does not know for sure who made the decision to discharge Richard, but that it was either Major Hebert, Major Palmisano, Chief Oswald, or Sheriff Strain. But, Major Sharp attests in his affidavit that *he* made the decision to terminate Richard's employment:

> On August 9, 2016, I determined that Mark Richard had not met the standards to continue with any training provided by the STPSO considering Mark Richard was in his introductory period.

Viewing the facts, on this record, there is a serious fact dispute about whether the plaintiff would not have been fired but for his complaint to Lieutenant Toups about the sexually explicit conversations and conduct to which he had been exposed in the Radio Room. Accordingly, summary judgment in favor of Sheriff Smith as to Richard's Title VII retaliation claim is not warranted.

### III.

The plaintiff also alleges that the defendant violated the Age Discrimination in Employment Act by creating an ageist hostile work environment and then retaliating against him for his complaints of age-based harassment. Richard contends that Deputy Penton frequently made offensive, ageist comments towards him and that his complaints of age-based harassment led to the loss of his ticket-writing privileges and his subsequent demotion to the Radio Room.

*A.*

The ADEA prohibits an employer from taking adverse action against its employee because of the employee's age. 29 U.S.C. § 623(a); <u>Gross v. FBL Fin. Servs., Inc.</u>, 557 U.S. 167, 170 (2009). It also creates a cause of action for hostile work environment based on age discrimination. <u>Dediol v. Best Chevrolet, Inc.</u>, 655 F.3d 435, 441 (5th Cir. 2011). To establish a prima facie case of an ageist hostile work environment, the plaintiff must establish:

> (1) he was over the age of 40; (2) [he] was subjected to harassment, either through words or actions, based on age; (3) the nature of the harassment was such that it created an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer.

<u>Id.</u> A work environment is hostile if is it "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently pervasive to alter the conditions of the victim's employment;" to meet this standard, the conduct must be both objectively and subjectively offensive. <u>Id.</u> (quoting <u>Alaniz v. Zamora-Quezada</u>, 591 F.3d 761, 771 (5th Cir. 2009)).

Here, Richard satisfies the first prong of his prima facie case because he is over 40 years old. He also presents evidence to satisfy the second prong – that he was subjected to harassment based on age – through his testimony that Deputy Patrick Penton "constantly" made age-based, derogatory comments toward him on various occasions. He was called names like "old man" and asked

whether he could "still get it up."  Penton would also ask whether

Richard needed to take Geritol or have Jello to digest his food.

To satisfy the third element – that the harassment created a

hostile work environment – Richard must demonstrate a genuine issue

of material fact that the conduct was both objectively and

subjectively offensive.  Although the record reflects that

Penton's comments were subjectively offensive, in light of

Richard's repeated requests that Penton stop and his complaints to

Corporal Holloway and Lieutenant Wicker, whether they were

objectively offensive is less clear on this record.

To evaluate whether conduct is objectively offensive, courts

consider: "(1) the frequency of the discriminatory conduct; (2)

its severity; (3) whether it is physically threatening or

humiliating, or merely an offensive utterance; and (4) whether it

interferes with an employee's work performance."  Id. (quoting

EEOC v. WC&M Enters., 496 F.3d 393, 399 (5th Cir. 2007)).  The

Fifth Circuit has held that repeated, profane references to the

claimant's age within the work setting may give rise to an

actionable hostile work environment claim.  Id. at 443-444.

According to Sheriff Smith, Penton's ageist comments were not

objectively offensive because they did not affect Richard's job

performance or any other aspect of his professional duties.  For

support, Sheriff Smith invokes Reed v. Neopost USA, Inc., 701 F.3d

434, 443 (5th Cir. 2012), in which the Fifth Circuit held that an

employee presented no genuine issue of material fact that his work environment was hostile where he claimed that "various coworkers called him names like 'old man,' 'old fart,' 'pops,' and 'grandpa.'" The Fifth Circuit reasoned that the claimant provided little detail as to the identity of his harassers or the frequency of their comments, presented no evidence that the comments were physically threatening or humiliating, and failed to indicate how the comments interfered with his job performance. Id.

Sheriff Smith's reliance on Reed is misplaced. The record reflects that, within a few months after they began working together, Deputy Penton began to make derogatory comments about Richard's age. Although not physically threatening, the comments were felt to be humiliating, vulgar in nature, and frequently made "in front of calls for service, in public, [and] in restaurants."[11] Relatedly, Mr. Richard explained during his deposition that the derogatory comments interfered with his work performance because they were constant and made while responding to calls:

> So, Penton and I would work together and the derogatory comments would just . . . You know, after a while, a fly's around bugging you, it's one thing. When you've got flies constantly around you, it becomes a real problem. But that's how it was, it was like, it became a real disruption to the job. And doing it in front of victims, calls for service, very unprofessional.

---

[11] Whether they were or were not must await trial on the merits.

Richard also testified that he reported the comments to his immediate superior, Corporal Holloway, but that his complaints were disregarded. Relatedly, Penton did not relent, and instead is said to have mocked Richard for threatening to report him again. On this record, a genuine issue of material fact exists as to whether the STPSO was an ageist, hostile work environment for Richard.

*B.*

Richard next contends that the defendant retaliated against him for complaining of the ageist comments. To establish a prima facie case of retaliation under the ADEA, the claimant must show "(1) that he engaged in a protected activity, (2) that there was an adverse employment action, and (3) that a causal link existed between the protected activity and the adverse employment action." Wooten v. McDonald Transit Ass'n. Inc., 788 F.3d 490, 496-497 (5th Cir. 2015).

Richard bases his ADEA retaliation claim on two incidents: (1) the revocation of his ticket-writing privileges after he complained to Corporal Holloway about Penton's derogatory, ageist comments, and (2) his transfer from the criminal patrol division to the Radio Room after he reported Penton's age-based harassment to Lieutenant Wicker. It is undisputed that Richard engaged in protected activity each time he complained to his superiors about Penton's derogatory, age-related comments. However, Sheriff Smith

submits that Richard cannot prove that he suffered an adverse employment action, or that his complaints of ageist harassment were the but-for cause of either adverse decision.

"To establish an adverse employment action [in the context of an ADEA retaliation claim], the plaintiff must show that 'a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Wooten, 788 F.3d at 499 n.5 (quoting Burlington N. & Santa Fe. Ry. Co. v. White, 548 U.S. 53, 68 (2006))). In other words, a retaliation claim can be actionable, even though the employment action taken was not an "ultimate employment decision[]." See McCoy, 492 F.3d at 560.

Here, Richard submits that his ticket-writing privileges were suspended from February 3, 2016 until March 1, 2016 and that he was transferred from criminal patrol to the communications division on April 7, 2016. Because the record reflects that Richard's transfer to the Radio Room was accompanied by a reduction of nearly $10,000 in annual pay and that the one-month suspension of his ticket-writing privileges significantly reduced his authority as a deputy in the criminal patrol division, material fact issues clearly exist as to whether each employment action was "materially adverse." See id. at 561 ("[P]lacement on administrative leave may carry with it both the stigma of the

suspicion of wrongdoing and possibility significant emotional distress.").

Genuine factual disputes also exist as to the third element of Richard's prima facie case – whether his protected activity was the but-for cause of each adverse employment action he suffered. See Heggemeier v. Caldwell Cty., 826 F.3d 861, 869 n.4 (5th Cir. 2016) ("The ADEA requires 'but-for causation.'") (quoting Grosss v. FBL Financial Services, Inc., 557 U.S. 167, 177 (2009)). With respect to the suspension of his ticket-writing privileges, Richard submits that Penton began making derogatory comments about his age during the fall of 2015, that he complained to Corporal Holloway about the age-based harassment, and that he was notified on February 3, 2016 that his ticket-writing privileges would be suspended. And as for Richard's demotion to the Radio Room, the record shows that the decision was made on April 7, 2016 – only 17 days after Richard lodged his March 21 complaint with Lieutenant Wicker. The proximity in time between Richard's protected activity and each adverse employment action he suffered could be sufficient to support his prima facie case of unlawful retaliation. See Stephens v. Bd. of Supervisors, No. 16-6885, U.S. Dist. LEXIS 211800, at *13 (E.D. La. Dec. 27, 2017) ("In cases with '[c]lose timing between an employee's protected activity and an adverse action against [her],' a plaintiff may satisfy the causation

requirement of her *prima facie* case through the evidence of proximity alone.") (citations omitted).

Finally, the defendant fails to articulate any legitimate, non-retaliatory for the revocation of Richard's ticket-writing privilege. And while the defendant submits that Richard was transferred to the Radio Room because he committed a Group 3 safety violation in connection with the Million Dollar Road incident, genuine factual disputes exist as to whether the defendant's proffered reason is pretext for retaliation.

To establish pretext, "the plaintiff must show a conflict in substantial evidence on the question of whether the employer would not have taken the action but for the protected activity." Rodriguez v. Brownsville Indep. Sch. Dist., 739 F. App'x 227, 231 (5th Cir. 2018) (per curiam) (unpublished). Richard first submits that it is unclear from the record who made the decision to transfer him to the Radio Room. Although Lieutenant Wicker attests in his affidavit that that he investigated the Million Dollar Road incident and determined that Richard had committed a Group 3 safety violation, he acknowledges that he reported his conclusions to Captain Richard Magee and that they were reviewed by his superiors Human Resources. He then clarified during his deposition that Captain Donna Schlesinger, the Director of Human Resources, made the decision. But, Captain Schlesinger testified during her own deposition that she was on sick leave when Richard was transferred

and, therefore, was not responsible for the decision. Further complicating matters, the Employee Counseling Form associated with the incident bears the signatures of Captain Richard Magee of Criminal Patrol and Major Sterling Hebert of Human Resources but does not identify either individual as the ultimate decisionmaker.

Richard next points to Lieutenant Wicker's inability to identify any other instance in which a patrol deputy had been demoted for the improper use of emergency lights in a non-chase situation:

> **Q:** Okay. So the flip side of that was you don't know of any specific Class 3 demotions, other than Richard, correct?
> **A:** Correct. I thought I said that already.
> **Q:** Okay. All right. And same question regarding emergency lights. How many demotions are you aware of for deputies because of a violation of emergency lights, not involving a chase?
> **A:** I'm not aware of any.

Relatedly, Richard presents evidence, in the form of his own deposition testimony, that another deputy suffered no disciplinary action whatsoever after engaging in at least two unprovoked acts of violence with members of the public. Richard testified that, while training to work as a patrol deputy, he witnessed Deputy Cecil Hoyt choke a young man who had already been restrained and slam an intoxicated woman's head to a concrete floor. Richard further testified that, when he reported these incidents to his superiors, he was called to see Major Porter and Lieutenant Caminita, who accused him of doing "something wrong."

Further compounding the presence of material disputed fact issues are the questionable circumstances surrounding the Million Dollar Road incident. It is undisputed that Lieutenant Wicker's finding that Richard positioned his squad car in the middle of the roadway with no emergency lights on, as well as his determination that Richard committed a Class 3 safety violation, are based solely upon written statements from five witnesses: Mr. Richard, Deputy Penton (Richard's harasser), Corporal Holloway (the superior to whom Richard initially complained about the age-based harassment), Kyle Mclain (a bystander), and Michaela Rodosta (a woman Richard believes attempted to kill him). That the two individuals responsible for creating and maintaining Richard's ageist hostile work environment provided statements to Wicker – that Richard submits are false – raises serious questions as to the validity of Wicker's findings.

Finally, although Lieutenant Wicker determined that plaintiff's alleged non-use of overhead emergency lights was improper, he acknowledged during his deposition that he is unaware of any STPSO regulation that would establish the proper use of emergency overhead lights:

> **Q.** [T]here's no rule that you can point me to that said he should have had one, emergency lights on at all, or two, front and back on, at all? I understand it might be common sense to do it, but there's no written regulation that says that, is there?
> **A.** Not that I'm aware of.

Lieutenant Wicker further conceded that deputies have discretion to decide how and when to deploy their overhead emergency lights:

> **Q.** . . . I'm just wondering, it would be the deputy's discretion on which of the emergency lights to deploy, and this is specific to the Million Dollar Road incident, it would have been Mr. Richard's discretion which lights to use, correct[]?
> **A.** I guess the answer is yes.

In light of serious disputed fact questions that turn upon the credibility of witnesses, summary dismissal of Richard's ADEA retaliation claim is patently inappropriate.

Accordingly, for the foregoing reasons, IT IS ORDERED: that the defendant's motion for summary judgment is hereby DENIED.

New Orleans, Louisiana, April 17, 2019

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE