## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MARK RICHARD,** | * | **CIVIL ACTION** |
| **Plaintiff** | * | |
| | * | **NO. 17-9703** |
| **VERSUS** | * | |
| | * | **JUDGE FELDMAN** |
| | * | |
| **ST. TAMMANY PARISH SHERIFF'S** | * | **MAG. JUDGE VAN MEERVELD** |
| **DEPARTMENT,** | * | |
| **Defendant** | * | **JURY DEMAND** |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

---

### PRE-TRIAL ORDER

---

The following Pre-Trial Order is submitted by counsel in this matter in accordance with

the rules of court:

**1.   DATE OF THE PRE-TRIAL CONFERENCE**

The pre-trial conference in this matter is set for **Thursday, August 12, 2021, at 1:45 p.m.**

**2.   APPEARANCE OF COUNSEL**

**For the Plaintiff:**

**John Oliver Pieksen, Jr. (# 21023) (T.A.)**
**Michael G. Bagneris (# 2658)**
**Bagneris, Pieksen & Associates, LLC**
**935 Gravier Street, Ste 2110**
**New Orleans, LA 70112**
**Telephone:    (504) 493-7990**
**Facsimile:    (504) 493-7991**
**pieksen@bpajustice.com**
**bagneris@bpajustice.com**

**For the Defendant:**

**Chadwick W. Collings (La. Bar #25373) (T.A.)**
**Christopher R. Burge (La. Bar #39473)**
**Milling Benson Woodward L.L.P.**
**68031 Capital Trace Row**
**Mandeville, Louisiana 70471**
**Telephone: 985-292-2000**
**Facsimile: 985-292-2001**
**ccollings@millinglaw.com**

3.      **DESCRIPTION OF THE PARTIES**

Plaintiff:     **MARK RICHARD** is a person of full age and majority, who is domiciled in the State of Louisiana. Mr. Richard has brought the lawsuit in question for damages sustained as a result of alleged hostile work environments and retaliation associated with his prior employment with the St. Tammany Parish Sheriff's Office ("STPSO").

Defendant:     **SHERIFF RANDY SMITH** is the duly elected Sheriff for the Parish of St. Tammany, successor in interest to former Sheriff Rodney J. Strain, and the former employer of Mr. Richard.

4.      **JURISDICTION**

Plaintiff filed this lawsuit in the United States District Court for the Eastern District of Louisiana pursuant to Federal Question Jurisdiction per 28 U.S.C. §1331, over Plaintiff's claims arising under 42 U.S.C. 2000e *et seq.* ("Title VII") and 29 U.S.C. 621 *et seq.* ("ADEA").

Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

5.      **MOTIONS PENDING OR CONTEMPLATED**

**PLAINTIFF:**

Plaintiff anticipates filling motions in limine to exclude cumulative, newly-added, prejudicial and/or irrelevant witnesses and exhibits, including documents that include hearsay within hearsay such as the Million Dollar Road "statements", and attempts by defendant to explain employment decisions using third-party explanations (such as Lt. Wicker saying what Maj. Sharp or Capt. Magee said, etc.). Plaintiff will also file motions in limine to exclude irrelevant and prejudicial exhibits and testimony regarding events and/or conduct that occurred prior to the operative timeframe of this dispute, which is from the Fall of 2015, when the ageist comments by Deputy Penton begam, through August 9, 2016, when Plaintiff was unlawfully terminated from employment (such as

testimony from Plaintiff's ex-wife, ex-girlfriend, alleged complaints against Plaintiff from 2013, Plaintiff's prior job applications, and other similar matters)

**DEFENDANTS:**

Defendants currently have pending the following:

- a motion *in limine* to preclude the testimony or evidence regarding Plaintiff's dismissed claims,
- a motion *in limine* to preclude evidence or testimony regarding any government/grand jury investigations into the administration of former St. Tammany Parish Sheriff Rodney Strain,
- a motion *in limine* to preclude testimony or evidence on any alleged incidents involving Cecil Hoyt's alleged excessive force,
- a motion *in limine* to preclude testimony or evidence regarding any other litigation involving Sheriff Smith or the STPSO, including but not limited to litigation involving former STPSO Chief Deputy Fred Oswald,
- a motion *in limine* to exclude evidence or testimony regarding criminal patrol statistics associated with Plaintiff's tenure as a criminal patrol deputy,
- a motion *in limine* to preclude testimony or evidence regarding any discovery disputes,
- a motion *in limine* to preclude testimony or evidence regarding any references to witnesses not called when they are equally accessible to both parties,
- a motion *in limine* to preclude testimony or evidence regarding plaintiff's economic damages, and

Defendants contemplate filing additional motions *in limine* regarding plaintiff's exhibits that have not been provided to counsel for the Sheriff, and also contemplate additional motions *in limine* to exclude irrelevant evidence. Defendants were also informed yesterday, August 9, 2021, that fact witness Heather Doles is 34 weeks pregnant and therefore unlikely to be available at trial. Defense has asked Plaintiff counsel about perpetuating Ms. Doles' testimony but has received no response as of yet. Defendant may therefore file a motion to perpetuate her testimony with a request for expedited consideration.

6. **MATERIAL FACTS:**

   **PLAINTIFF'S ALLEGATIONS OF FACTS:**

1. As of the Fall of 2015, Plaintiff was a POST-certified Road Deputy with the STPSD;

2. Starting in the Fall of 2015, Plaintiff was subjected to derogatory age-based comments from Deputy Penton;

3. Plaintiff complained about the age-based comments to Penton, and then his supervisors,

Corporal Holloway and Lt. Wicker;

4.  Penton told Plaintiff that if he reported Penton's actions, nothing would come of it;

5.  The derogatory age comments did not stop;

6.  On February 3, 2016, shortly after making the complaint, two of Richard's superiors, Lt. Wicker and Corporal Holloway, notified Richard that his ticket-writing privileges would be suspended until March 1, 2016;

7.  On March 17, 2016, a few hours after Richard had again asked Penton to stop making derogatory age-based comments, Richard was patrolling on Million Dollar Road when he pulled over to speak with Kile McLain, a young man he observed walking alone on the street;

8.  While obtaining the man's personal information, a vehicle driven by Michaela Radosta came towards Richard and skidded right past him, nearly running him over. Richard promptly contacted dispatch to report what had occurred;

9.  Richard had previously encountered Radosta while in the field, as he had pulled over a car in which she was riding, smelled marijuana, and arrested the driver, and on another occasion, was called to enforce a court order against Radosta, which required him to physically remove her three-year-old daughter from her custody;

10. Richard also was aware that Radosta had recently posted pictures on social media which advertised that she was selling marijuana out of her trunk;

11. Within minutes of Richard's radio call, Deputy Penton and Corporal Holloway arrived and spoke with Radosta, and they allowed her to leave the scene without running a warrant check, sobriety check or asking to search the vehicle, and without issuing a summons for her reckless/careless driving;

12. On March 21, 2016, the following Monday, Wicker called Richard into his office to discuss the incident at Million Dollar Road;

13. Richard told Wicker about the issues he had with Penton earlier that evening, and that he (Richard) wanted to make a complaint about the age-based harassment;

14. Wicker assured Richard that he would see about making a report;

15. No report was ever made, and HR never conducted an investigation into Richard's age-based complaints;

16. That same day, Lieutenant Wicker met with Corporal Holloway and ordered him to obtain statements from 5 witnesses to the Million Dollar Road incident: Richard, Holloway, Penton, Radosta, and McLain;

17. Wicker concluded that Richard had parked his vehicle in the middle of the roadway in the dark with no emergency lights on, and Wicker also concluded that such conduct amounted to a Group 3 safety violation;

18. Wicker sent his determination to Captain Schlesinger in H.R. so that H.R. could impose whatever discipline that may have been warranted;

19. Defendant has been unable to identify exactly who made the decision to demote Richard;

20. On March 31, 2016, Richard slammed his hand in a car door while on a call for duty, causing an open break of a right-hand finger, was treated at the St. Tammany Hospital emergency room and sent home on medical leave, and was out of work for eleven weeks because the injury caused nerve damage and required physical therapy;

21. While on leave, Richard was contacted by Human Resources on April 7, 2016 concerning the Million Dollar Road incident and was advised that he was being demoted from road patrol and

reassigned to the Radio Room to serve as a dispatcher;

22. Richard's annual pay was also reduced by nearly $10,000;

23. No other Road Deputy had ever been demoted to the Radio Room for an alleged Class 3 violation;

24. No other Road Deputy had ever been demoted to the Radio Room for a non-chase related use of overhead lights;

25. Wicker admitted at deposition that Richard had the discretion regarding how to deploy his overhead lights;

26. Wicker could not identify any specific STPSD policy regarding the use of overhead lights;

27. Richard requested an Administrative Review Board, which was convened on May 9, 2016, and after considering testimony and reviewing evidence, the ARB affirmed Richard's demotion from road patrol to communications;

28. The photos Radosta had posted on social media, in which she appeared to be holding marijuana, were provided to Wicker but were not considered by the ARB;

29. Richard returned from medical leave on June 21, 2016 and reported to the Radio Room for his introductory period in the communications division as a dispatcher;

30. Contrary to STPSD rules, protocol and practice, Richard was not given a typing test (CritiCall) before being assigned to, or commencing duties in, the Radio Room.

31. Despite still wearing a splint on his finger and suffering from extensive nerve damage, Richard was required to type continuously during his 12-hour shifts;

32. There was a position supporting the NCIC clerk that required less typing, but Richard was not offered or allowed to work in that position;

33. Working with eight females and one young male, Richard claims he was also exposed to sexually explicit conversations and conduct by his Radio Room co-workers;

34. Richard testified during his deposition that, beginning with his first shift in the Radio Room, "it was like Girls Gone Wild episodes, every single one," that female dispatchers, including his immediate rank, Sergeant Amy Poppler and Corporal Brittany Harbin, would "talk[] about sexual stuff, sexual positions, oral sex techniques" and "pass[] a ruler around showing penis sizes they preferred," and that, on at least four occasions, Sergeant Poppler performed what she called her "sexy dance";

35. Richard complained of this behavior, calling it "unprofessional" and "offensive."

36. After his first week of training, Richard met with Sergeant Poppler, Corporal Harbin, and Miranda Mobley, his field training officer ("FTO") for Phase 1 of the introductory period, who advised Richard that he had been caught falling asleep during two of his shifts; he left that meeting with a warning, and no further allegations of sleeping or snoring were made against Richard;

37. About three weeks later, on July 18, 2016, Richard was called into Lieutenant Toups's office with Sergeant Poppler, and was told that he was struggling in the Radio Room and asked why he did not participate in workplace conversations;

38. Richard explained that the constant typing irritated his hand injury and caused a shooting pain in his arm, that FTO Mobley was being too hard on him, that he carefully avoided the conversations because his participation could easily be construed as sexually offensive, and that he wished to make a formal complaint of the unprofessional sexually hostile work environment;

39. Sergeant Poppler replied that they were not used to having men in the Radio Room and that she would talk with the others about his complaint;

40. No investigation into Richard's complaints of a sexually-hostile Radio Room were conducted by STPSD;

41.  When Richard returned to his desk after the July 18, 2016 meeting, he was immediately reassigned to Corporal Harbin for the remainder of his Phase 1 training;

42. The next morning, on July 19, 2016, Corporal Harbin instructed Richard to take a typing test, for the first time;

43. Also on July 19, 2016, Major Doug Sharp began his command of the communications division, including the Radio Room;

44. All Radio Room employees are required, by STPSD practice and procedure to take a typing test before they begin their duties in the Radio Room;

45. Richard attempted the test twice, scored a 21 and 22 words-per-minute, respectively, but failed to meet the 25-word-per-minute "cutoff score";

46. Harbin also administered unannounced, written exams, all of which Mr. Richard successfully completed;

47. For the three weeks following his July 18, 2016 meeting with Lieutenant Toups and Sergeant Poppler,  no one would speak to Richard, and the workplace environment became  increasingly hostile;

48. After completing his first six weeks of training, Richard was recommended for, and assigned to, a promotion to Phase 2 of his training in the Radio Room, as of August 8, 2016;

49. When he arrived to work for his first day as a Phase 2 trainee, on August 8, 2016, Richard

was advised that he could leave early because Human Resources needed to see him the next morning;

50. On August 9, 2016, Richard reported to Human Resources, where Major Doug Sharp stated that he was terminated "due to [his] struggling in the Radio Room";

51. Major Doug Sharp attests in his affidavit that *he* made the decision to terminate Richard's employment because Richard "had not met the standards to continue with any training provided by the STPSO considering Mark Richard was in his introductory period with the communications division and had not demonstrated that he could perform the essential requirements of his job duties, as documented by Lt. Brandy Toups";

52. Captain Schlesinger testified that either Major Palmisano, Major Hebert, Chief Oswald or Sheriff Strain made the decision to fire Richard, not Major Sharp;

53. Major Sharp attached to his affidavit the Employee Counseling Form issued in connection with Richard's termination, which provides that Richard was discharged because he "ha[d] not demonstrated that he c[ould] perform the essential requirements of his job duties required to be a Deputy in Communications";

54. Major Sharp's affidavit specifically identified Richard's sleeping on duty, difficulty accepting criticism, and inadequate typing speed as "issues";

55. According to an End of Phase Evaluation form dated August 7, 2016, Corporal Harbin recommended that "Richard move on to the radio phase of training," but continue "to practice typing and [] continue to work on his speed of entry of calls";

56. Lt. Toups signed the 8/8/16 End of Phase Evaluation on August 8, 2016;

57. Cpl. Harbin signed the 8/8/16 End of Phase Evaluation on August 7, 2016.

**DEFENDANTS ALLEGATIONS OF FACT:**

1. On or about December 3, 2013, Mark Richard ("Plaintiff") was hired by the St. Tammany Parish Sheriff's Office ("STPSO") as a Recruit in Criminal Patrol. Upon completion of his new hire training, he began his Field Training Officer ("FTO") in the Criminal Patrol Division. Upon his successful completion of the FTO program in March of 2014, Richard was released by his FTO officers to work solo.

2. Plaintiff did not report to Cpl. Holloway nor Lt. Wicker any complaints regarding purported ageist comments made by Deputy Patrick Penton prior to the March 18, 2016 incident.

3. The STPSO was never made aware of Plaintiff's ADEA complaints regarding Dy. Penton.

4. On March 21, 2016, Cpl. Tony Holloway and Sgt. Emile Lubrano met with Lt. Wayne Wicker in reference to a reported safety violation made by Plaintiff on March 18, 2016.

5. Lt. Wicker ordered Cpl. Holloway to collect statements from all witnesses to the incident and present them to Lt. Wicker for review.

6. Lt. Wicker reviewed the written statements of Plaintiff, Cpl. Holloway, Dy. Patrick Penton, Michaela Rodosta and Kile Mclain and the incident report for event no. 2016-037874;

7. Following his review of these materials, Lt. Wicker concluded that the actions of Plaintiff constituted a Group 3 safety violation by jeopardizing the safety of plaintiff, the subject (Kile Mclain) of which he was investigating on the side of the road, and the driver of the vehicle (Michaela Rodosta), as Lt. Wicker determined Plaintiff had parked his vehicle in the middle of the roadway, in the dark, with no emergency lights on.

8. Lt. Wicker's findings were reported to Captain Richard Magee, who, concluded disciplinary action was necessary for this Group 3 safety violation.

9. On April 7, 2016, Plaintiff was transferred from criminal patrol to the STPSO communications division based upon the finding of a group 3 safety violation;

10. Plaintiff then requested an Administrative Review Board ("ARB") be convened in order to review his transfer to communications and reduction in pay;

11. On Monday, May 9, 2016, the ARB was convened, heard testimony and received evidence regarding Plaintiff's appeal.

12. Following Plaintiff's closing argument to the board, the ARB convened in executive session to review the evidence and testimony.

13. Following consideration of all testimony and evidence admitted, the ARB voted to affirm Plaintiff's transfer from patrol to communications as originally written.

14. On June 15, 2016, the STPSO received a Return-to-Work Status physician note regarding Mr. Richard's medical leave. Specifically, this physician note indicated that Mr. Richard was cleared to return to "regular duty" effective June 21, 2016 with no restrictions.

15. On June 21, 2016, Plaintiff returned to full duty following a period of medical leave. Due to his transfer from another division and in accordance with STPSO policy, Plaintiff began his introductory period in the communications division.

16. Pursuant to DR 03:02.700.01, an introductory period is generally considered twelve (12) calendar months for new hires and six (6) months for current employees transferring to a new position.

17. On June 21, 2016, Plaintiff was assigned to B team with Jessica Mobley as his field training officer ("FTO") for Phase 1 of his introductory period.

18. On June 24, 2016, Plaintiff was observed falling asleep several times during his shift. FTO Mobley also documented Plaintiff's lack of interest in his new career on this day.

19. On June 25, 2016, Plaintiff was again observed falling asleep during his shift and snoring.

20. On June 29, 2016, a meeting was held with Plaintiff and his rank regarding his sleeping on duty. A verbal warning was issued during this meeting.

21. On July 4, 2016, Plaintiff was given FTO Doles for the next two shifts as FTO Mobley was on vacation.

22. On July 9, 2016, Plaintiff began to have issues with accepting constructive criticism regarding his training and would become defensive when confronted with his mistakes.

23. On July 14, 2016, Plaintiff again became argumentative and began denying errors that he had made.

24. On July 18, 2016, a meeting was held with Plaintiff, Lt. Brandy Toups and Sgt. Amy Poppler in reference to his failing the FTO program. At this meeting, Plaintiff stated that he felt his current FTO was hard on him. Following this meeting, Lt. Toups assigned a new FTO to Plaintiff to complete his training in Phase 1 of the

FTO communications program. This new FTO assignment was made due to Plaintiff's stated belief that his previous FTO was hard on him.

25. On July 19, 2016, it was learned that Plaintiff had not taken the entrance typing test that all applicants must take before being hired for the communications division. The first portion of this test is a typing test, which requires the applicant to type 25 words per minute before being allowed to proceed further. The ability to type faster than 25 words per minute is a requirement of communications division deputies.

26. The STPSO utilizes Computer Aided Dispatch to take and process calls for service from the citizens of St. Tammany Parish. As such, it is critical that all deputies assigned to the communications division be competent typists.

27. Plaintiff was administered the CritiCall Keyboarding test, which required a score of 25 words per minute to pass, twice. Plaintiff failed both times.

28. Plaintiff failed to meet the minimum 25 word per minute standard required of a communications division deputy.

29. From June 21, 2016 through August 9, 2016, at no point did Amy Poppler ever perform a "sexy dance" " by "squeez[ing] her breasts together and wiggl[ing] her butt across the office" while on duty as a dispatcher for the STPSO.

30. Additionally, at no point from June 21, 2016 through August 9, 2016 did any employee within the communications division, discuss "penis sizes . . ., oral sex techniques, and positions in which [dispatchers] liked to have sex."

31. At no point from June 21, 2016 through August 9, 2016 did any employee within the communications division, pass a ruler around the room in order to indicate a preferred length of penis size.

32. On August 9, 2016, Major Doug Sharp determined that Plaintiff had not met the standards to continue with any training provided by the STPSO considering Plaintiff was in his introductory period with the communications division and had not demonstrated that he could perform the essential requirements of his job duties.

33. Therefore, Major Sharp terminated Plaintiff's employment with the STPSO.

34. Richard's complaints regarding the radio room environment did not contribute to Major Sharp's decision to terminate Plaintiff's employment in any way.

35. The termination of Plaintiff's employment was consistent with the established policies and procedures of the STPSO.


7.    **UNCONTESTED MATERIAL FACTS:**

1. On or about December 3, 2013, Mark Richard ("Plaintiff") was hired by the St. Tammany Parish Sheriff's Office ("STPSO") as a Recruit in Criminal Patrol. Upon completion of his new hire training, he began his Field Training Officer ("FTO") in the Criminal Patrol Division. Upon his successful completion of the FTO program in March of 2014, Richard was released by his FTO officers to work solo.

2. On March 21, 2016, Cpl. Tony Holloway and Sgt. Emile Lubrano met with Lt. Wayne Wicker in reference to a safety violation allegedly made by Plaintiff on March 18, 2016.

3. Lt. Wicker ordered Cpl. Holloway to collect statements from all witnesses to the incident and present them to Lt. Wicker for review.

4. Lt. Wicker received and reviewed the written statements of Plaintiff, Cpl. Holloway, Dy. Patrick Penton, Michaela Rodosta and Kile McLain.

5. Following his review of these materials, it was determined that the actions of Plaintiff constituted a Group 3 safety violation by jeopardizing the safety of himself, the subject (Kile McLain) of which he was investigating on the side of the road, and the driver of the vehicle (Michaela Rodosta).

6. These findings were then communicated to Captain Richard Magee.

7. On April 7, 2016, Plaintiff was ordered transferred from criminal patrol to the STPSO communications division for Group 3 safety violations.

8. Plaintiff then requested an Administrative Review Board ("ARB") be convened in order to review his transfer to communications.

9. On Monday, May 9, 2016, the ARB convened, heard testimony and received evidence regarding Plaintiff's appeal.

10. Following consideration of the evidence and testimony submitted, the ARB voted to affirm Plaintiff's transfer from criminal patrol to the communications division as originally written.

11. STPSO DR 03:02.700.01(a) provides: "The Introductory Period is generally considered twelve (12) calendar months for new hires and six (6) calendar months for current employees transferring to a new position.

12. STPSO DR 03:02.700.01(c) provides: "The Sheriff, and/or his designee, shall decide either to extend the initial Introductory Period or remove the Introductory employee:

- at any time during the Introductory period,

- by informing the Director of Human Resources, in writing, of his/her decision, and,

- by communicating to the Director of Human Resources the reason for a decision to remove the employee.

13. On June 21, 2016, Plaintiff was assigned to B team of the communications division with Jessica Mobley as his field training officer ("FTO") for Phase 1 of his introductory period.

14. On June 29, 2016, a meeting was held with Plaintiff and his rank regarding his alleged sleeping on duty. A verbal warning was issued during this meeting and no further such allegations were ever forthcoming.

15. On July 4, 2016, Plaintiff was given FTO Doles for the next two shifts as FTO Mobley was on vacation.

16. Following a July 18, 2016 meeting between Plaintiff and his rank, Cpl. Brittany Harbin was assigned as Plaintiff's new FTO.

17. The STPSO utilizes Computer Aided Dispatch to take and process calls for service from the citizens of St. Tammany Parish.

18. On July 19, 2016, Plaintiff was administered the CritiCall Keyboarding test, which required a score of 25 words per minute to pass, twice. Plaintiff failed this test both times.

19. On August 9, 2016, Plaintiff was ordered to report to the STPSO Human Resources division. Upon arrival, Plaintiff was met by Major Doug Sharp, who was the Major over the communications division. Major Sharp terminated Plaintiff's employment.

20. The STPSO Employee Counseling Form provided to Plaintiff during this termination meeting was signed by Major Sharp and further provided that the stated reasons for termination were that Plaintiff had "not met the standards to continue with any training provided by the STPSO. He is currently in his introductory period with the STPSO and has not demonstrated that he can perform the essential requirements of his job duties required to be a Deputy in Communications."

## 8.   <u>CONTESTED ISSUES OF FACT:</u>

**A.** Defendant notes the following facts, which are apparently still contested by Plaintiff:

1) Did Plaintiff commit a Group 3 safety violation during the "Million Dollar Road" incident?

2) Was the Plaintiff transferred to the Communications Division because of his Group 3 violation?

3) Did Plaintiff fail to meet the minimum standards for a Communications Division employee?

4) Was the Plaintiff ever subjected to a hostile work environment?

5) Were the employment decisions by the Sheriff vis-à-vis the Plaintiff made as a result of the Plaintiff's own poor job performance and not as a result of any retaliatory intent?

**B.** Plaintiff notes the following contested facts, which are primarily derived from the Court's Order denying defendant's MSJ:

1) Did Plaintiff's co-workers and superiors in the Radio Room engage in vulgar and sexually-explicit language and conduct, and if so, how often?

2) Did Plaintiff complain about his co-workers and superiors in the Radio Room who engaged in vulgar and sexually-explicit language and conduct?

3) Did Plaintiff's co-workers and superiors in the Radio Room use of vulgar and sexually-explicit language and conduct interfere with his work performance?

4) Was Plaintiff reluctant to interact with his co-workers and participate in their sex-based conversations because he found them offensive and out of fear he would be accused of sexual harassment?

5) Was Plaintiff ostracized by co-workers and superiors in the Radio Room after he complained about the vulgar and sexually-explicit language and conduct?

6) Was Plaintiff subjected to unannounced typing tests and written exams after he complained about the vulgar and sexually-explicit language and conduct?

7) Did defendant, through Lt. Toups, Capt. Schlesinger and/or others, investigate Plaintiff's complaints of a sexually-hostile work environment in the Radio Room, and take prompt and remedial action?

8) Did defendant deviate from its normal policies and procedures when administering typing tests to Plaintiff?

9) Why did Defendant deviate from its normal policy and procedure by failing to give Plaintiff a typing test when he began working in the Radio Room?

10) Why did defendant give Plaintiff typing tests on July 19, 2016, the day after he complained about a sexually-hostile work environment in the Radio Room, and three weeks after he began working there?

11) Is defendant's proffered reason for Plaintiff's termination a pretext?

12) Did Plaintiff sleep/snore on the job during Radio Room training?

13) Did Plaintiff have issues accepting constructive criticism during Radio Room training?

14) Was Plaintiff argumentative and/or in denial regarding alleged mistakes made during training in the Radio Room?

15) Did the CritiCall Keyboarding test computer function properly?

16) Was Plaintiff's reassignment to FTO Cpl. Harbin, on July 19, 2016, the day after he complained about a sexually-hostile work environment in the Radio Room, retaliatory?

17) Did Major Sharp intentionally lie in his MSJ affidavit?

18) What specific "documentation" by Lt. Toups did Major Sharp rely, as stated in his MSJ affidavit?

19) Did Lt. Toups intentionally lie in her MSJ affidavit?

20) What "documentation" did Lt. Toups rely on to support her contention that Plaintiff was not performing adequately in the Radio Room, as stated in her MSJ affidavit?

21) Did Brittany Harbin intentionally lie in her MSJ affidavit?

22) What "documentation" did Harbin rely on to support her contention that Plaintiff was not performing adequately in the Radio Room, as stated in her MSJ affidavit?

23) Who made the decision to terminate Plaintiff?

24) Is typing 25 wpm actually a requirement to work in the Radio Room?

25) Why was Plaintiff not assigned to, or offered, the position to support the NCIC clerk in the Radio Room, as that position required less typing?

26) Why was Plaintiff allowed to continue to work for three weeks after failing the typing tests?

27) Why was Plaintiff never retested regarding the typing tests?

28) Why was Plaintiff encouraged to continue practicing his typing, as stated in the 8/8/16 End of Phase Evaluation?

29) Why was Plaintiff allowed to start Phase 2 of Radio Room training if he was failing Phase 1?

30) Did Deputy Penton's derogatory age-based comments create an ageist hostile work environment?

31) Did Deputy Penton's derogatory age-based comments affect Plaintiff's job performance or interfere with his performance?

32) Did Cpl. Holloway act on Plaintiff's complaints of an ageist hostile work environment?

33) Did Lt. Wicker act on Plaintiff's complaints of an ageist hostile work environment?

34) Did Capt. Schlesinger act on Plaintiff's complaints of an ageist hostile work environment?

35) Did defendant investigate Plaintiff's complaints of an ageist-hostile work environment in the Road Deputy/criminal patrol context, and take prompt and remedial action?

36) Did defendant deviate from its normal policies and procedures when "investigating" the Million Dollar Road incident?

37) Why were Plaintiff's ticket-writing privileges revoked?

38) Was Plaintiff's loss of ticket-writing privileges retaliatory?

39) Who issued the order regarding Plaintiff's loss of ticket-writing privileges?

40) Did Defendant deviate from its normal policy and procedure when ordering Plaintiff's loss of ticket-writing privileges?

41) Is defendant's proffered reason(s) for Plaintiff's demotion to the Radio Room a pretext?

42) Was Plaintiff's demotion to the Radio Room retaliatory?

43) Who ordered Plaintiff's demotion to the Radio Room?

44) Did Defendant deviate from its normal policy and procedure when ordering Plaintiff's demotion to the Radio Room?

45) Was Plaintiff's demotion to the Radio Room a materially adverse employment action?

46) Did Plaintiff actually commit a Class 3 violation?

47) Have any other Road Deputies ever been demoted to the Radio Room for an alleged violation involving the use of emergency lights, in a non-chase scenario?

48) Have any other Road Deputies ever been demoted to the Radio Room for an alleged Class 3 violation?

49) What is defendant's normal policy and procedure regarding the use of emergency lights?

50) What is defendant's normal policy and procedure regarding the use of squad car overhead emergency lights?

51) What is defendant's normal policy and procedure regarding the positioning of squad cars during patrol and/or questioning a member of the public?

52) Was Plaintiff treated differently than Deputy Cecil Hoyt, regarding discipline for offenses that allegedly endangered the public?

53) If so, why?

54) Why was Michaela Rodosta allowed to leave the scene of the Million Dollar Rod incident, despite Plaintiff's intention to cite her for, at a minimum, reckless driving?

55) Who actually drafted the Sharp, Toups and Harbin affidavits, and were any changes made thereto between initial draft and final product?

56) Who actually drafted the five (5) statements Lt. Wicker claims to have relied on regarding his "investigation" of the Million Dollar Road incident?

57) Why are none of the five (5) statements signed by the purported witnesses (let alone notarized)?

58) Why did Lt. Wicker choose to believe the two individuals responsible for creating and maintaining the ageist hostile work environment against Plaintiff; namely Deputy Penton and ex-Cpl. Holloway?

9. **CONTESTED ISSUES OF LAW:**

Plaintiff contends the following legal issues are in dispute:

1) Was Plaintiff's work environment sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive work environment while he was a STPSO Road Deputy in criminal patrol?

2) Was Plaintiff's work environment sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive work environment while he was assigned to the STPSO Radio Room?

3) Did defendant take prompt and remedial action regarding Plaintiff's complaints of age discrimination and an ageist hostile work environment?

4) Did defendant take prompt and remedial action regarding Plaintiff's complaints of sex discrimination and sexually-hostile work environment?

5) Has Plaintiff established the requisite casual connection, based on temporal proximity, and defendant's deviation from its typical policies and procedures, to prove his Title VII retaliation claim?

6) Has Plaintiff established the requisite casual connection, based on temporal proximity, and defendant's deviation from its typical policies and procedures, to prove his ADEA retaliation claim?

7) Has Plaintiff shown pretext by rebutting defendant's proffered reason for his termination, based on temporal proximity, defendant's deviation from its typical policies and procedures, defendant's conflicting positions regarding by whom and why Plaintiff was terminated, and the falsity of defendant's MSJ affidavits, regarding his Title VII retaliation claim?

8) Has Plaintiff shown pretext by rebutting defendant's proffered reason for his termination, based on temporal proximity, defendant's deviation from its typical policies and procedures, defendant's conflicting positions regarding by whom and why Plaintiff was demoted, and the falsity of defendant's MSJ affidavits, regarding his ADEA retaliation claim?

9) Is Plaintiff entitled to an award of punitive damages?

10) Is Plaintiff entitled to an award of attorney's fees?

11) Is Plaintiff entitled to an award of costs, expenses and judicial interest?

Defendant offered the following:

1) The amount of damages, if any, awardable to the plaintiff and any and all other issues implicit in the facts and pleadings.

2) Whether the Plaintiff carried his burden of proof in showing that a hostile work environment existed under either the ADEA or Title VII, and whether the Plaintiff carried his burden of proof in showing that he was retaliated against under the ADEA and Title VII.

3) Whether Defendant is entitled to judgment as a matter of law as to Plaintiff's Title VII HWE claim when the undisputed record reflects that STPSO took remedial action promptly after Plaintiff submitted his complaint.

10.   **EXHIBITS LIST:**

**PLAINTIFF'S EXHIBITS**

1. Plaintiff's Complaint and Amended Complaints.

2. Plaintiff's EEOC Charge and R-T-S Letter; Bates # STPSO MR 000137, 000139-000140

3. Plaintiff's federal income tax returns for 2015 through 2020, inclusive.

   **[Defendant objects on grounds of authenticity and hearsay, and that 2019 and 2020 records were untimely provided to Defendants.  Additionally, Defendant has filed a motion *in limine* to exclude evidence of economic damages and asserts that Defendant would be unduly prejudiced by having to respond to any assertions or calculations not timely provided by Plaintiff.]**

4. Facebook pictures of Michaela Rodosta with contraband **[Defendant objects to the admission of any such materials as the materials produced lack any**

**indicia of reliability or authenticity. Further, the materials contained within the pictures have not been scientifically examined and confirmed to be controlled dangerous substances] [Plaintiff counters that Lt. Wicker admitted receiving said pictures from Plaintiff around the time of the ARB hearing, yet STPSO failed to produce same in discovery and Plaintiff no longer has possession of same].**

5. Plaintiff's End-of Phase Evaluation dated 8/7/16; Bates # STPSO MR 001779.

6. Plaintiff's PHASE 2 DOR dated 8/8/16; Bates # STPSO MR 001780-001781.

7. Plaintiff's PHASE 1 DORs; Bates # STPSO MR (Exhibit VII to Plaintiff's MSJ Opposition).

8. Plaintiff's medical file re Occupational Injury of April 2016 (Exhibit VIII to Plaintiff's MSJ Opposition and other materials just produced by STPSD) **[Defendant objects on the grounds of relevance, as it is unclear exactly what specific records Plaintiff intends to introduce, and further objects if the medical records are introduced in an effort to raise the now dismissed ADA claim].**

9. Plaintiff's Payroll Status Report dated 4/7/16; Bates # STPSO MR 000230. **[Defendant objects as this exhibit was never identified on any of Plaintiff's Exhibit Lists filed into the record of this matter (See Rec. Docs. 38, 52 and 134). Additionally, Defendant has filed a motion *in limine* to exclude evidence of economic damages and asserts that Defendant would be unduly prejudiced by having to respond to any assertions or calculations not timely provided by Plaintiff.  Plaintiff counters that this exhibit was identified as it is an exhibit**

**already in the record as part of Plaintiff's successful Opposition to Defendant's Motion for summary judgment as a document produced to plaintiff by Defendant in discovery.]**

10. Bradley Osborn Master File Report (Exhibit XI to Plaintiff's MSJ Opposition) **[Defendant objects as this exhibit was never identified on any of Plaintiff's Exhibit Lists filed into the record of this matter (See Rec. Docs. 38, 52 and 134). Plaintiff counters that this exhibit was identified as it is an exhibit already in the record as part of Plaintiff's successful Opposition to Defendant's Motion for summary judgment as a document produced to plaintiff by Defendant in discovery.]**

11. Google Website pictures of 2016 Summer Olympics women's volleyball matches (to impeach Poppler's deposition testimony that Plaintiff made inappropriate remarks about women's volleyball players' breasts).) **[Defendant objects as this exhibit was never identified on any of Plaintiff's Exhibit Lists filed into the record of this matter (See Rec. Docs. 38, 52 and 134). Defendant further objects to any such materials based upon lack of authenticity and relevance; Lt. Poppler did not testify that she herself was familiar with any of the uniforms at the Olympics. Instead, she only testified that she heard remarks by Mr. Richard regarding such uniforms, which she considered inappropriate. In addition the admission of any such materials poses a risk of misleading the jury and unnecessarily increasing the time required for this matter.] Plaintiff counters that it is an impeachment exhibit.**

12. Plaintiff's medical records from Dr. Rock Hontas, including prescriptions as of the time Plaintiff was demoted to the Radio Room through his retaliatory termination.

**[Defendant objects to the extent such materials were not previously produced in discovery (No bates numbering ranges have been provided for these exhibits), irrelevant, unauthenticated, and unduly prejudicial.] Plaintiff counters that this exhibit was identified as part of the Plaintiff's medical records produced in discovery and for impeachment if Defendant claims that Plaintiff was fully recovered from his work injury and to impeach Radio Room personnel testimony that Plaintiff was fully able to type and was sleeping on the job.**

## DEFENDANT'S EXHIBITS

1. The St. Tammany Parish Sheriff's Office's Policies and Procedures Manual, including but not limited to STPSO DR 03:02.700.01, 07:100.00, 03:09.950.01, 03:09.975.01 [STPSO MR 000308-001321];

2. Any and all records of the Saint Tammany Parish Sheriff's Office, including but not limited to Plaintiff's Personnel File [STPSO MR 000001- 000307]; **Plaintiff objects as vague, given the 307 potential pages of this exhibit, as potentially irrelevant and unduly prejudicial, to the extent the records are unauthenticated, contain hearsay within hearsay, are not originals (contain highlighting and handwritten notes), lack proof of who created the record (such as the Million Dollar Road-related "statements), to the extent any records pertain to matters beyond the issues at hand (age and sex hostile environments, and retaliatory demotion and termination) [Defendant responds by noting that these records fall under the business records exception to the rules against hearsay as they are records of the regularly conducted business activities of the St. Tammany Parish Sheriff's Office. Further, as Plaintiff has not identified what particular page(s) has the highlights of which he complains, it is difficult for Defendant to respond other than to say that if there are highlights that are not part of the original records, these will be removed and replaced with unhighlighted copies before they are placed into evidence]**

3. The St. Tammany Parish Sheriff's Office's Employee Handbook [STPSO MR 001322-001377];

4. The St. Tammany Parish Sheriff's Office's job description for the position of dispatcher within the communications division [STPSO MR 001378-001379];

5. The St. Tammany Parish Sheriff's Office's posted EEOC notice [STPSO MR 001407];

6. Any and all records related to Plaintiff's Administrative Review Board proceedings related to his transfer to communications [STPSO MR 001424-001481]; **[Plaintiff objects as unauthenticated, and hearsay within hearsay.] [Defendant responds by noting that these records fall under the business records exception to the rules against hearsay as they are records of the regularly conducted business activities of the St. Tammany Parish Sheriff's Office.]**

7. The CritiCall Candidate Score Report for Mark Richard's two typing tests dated July 19, 2016 [STPSO MR 001506];

8. Any and all records related to Mark Richard's training and employment at the St. Tammany Parish Sheriff's Office, including but not limited to STPSO MR 001511-001781, 001795-002004, 002005-002514, 002518-002586; **Plaintiff objects as vague, given the undefined potential universe of this exhibit, as potentially irrelevant and unduly prejudicial, to the extent the records are unauthenticated, contain hearsay within hearsay, are not originals (contain highlighting and handwritten notes), lack proof of who created the record (such as the Million Dollar Road-related "statements), to the extent any records pertain to matters beyond the issues at hand (age and sex hostile environments, and retaliatory demotion and termination). [Defendant responds by noting that these records fall under the business records exception to the rules against hearsay as they are records of the regularly conducted business activities of the St. Tammany Parish Sheriff's Office.]**

9. STPSO CAD and Incident Report for Event #2013-155736 [STPSO MR 004804-004809]; **Plaintiff objects as irrelevant and unduly prejudicial, to the extent the records are unauthenticated, contain hearsay within hearsay, and to the extent any records pertain to matters beyond the issues at hand (age and sex hostile environments, and retaliatory demotion and termination). [Defendant responds that this evidence is intended solely to impeach the Plaintiff's credibility and rebut any potential allegations by Plaintiff that Dy. Cecil Hoyt engaged in excessive force. Further, these materials fall under the business records exception to the rules against hearsay as they are records of the regularly conducted business activities of the St. Tammany Parish Sheriff's Office].**

10. STPSO CAD and Incident Report for Event #2013-156205 [STPSO MR 004810-4826]; **Plaintiff objects as irrelevant and unduly prejudicial, to the extent the records are unauthenticated, contain hearsay within hearsay, and to the extent any records pertain to matters beyond the issues at hand (age and sex hostile environments, and retaliatory demotion and termination). [Defendant responds that this evidence is intended solely to impeach the Plaintiff's credibility and rebut any potential allegations by Plaintiff that Dy. Cecil Hoyt**

**engaged in excessive force. Further, these materials fall under the business records exception to the rules against hearsay as they are records of the regularly conducted business activities of the St. Tammany Parish Sheriff's Office].**

11.  Mark Richard's medical history, including but not limited to STPSO MR 004919-004921, 004954-004955, 005002, which are solely related to Plaintiff's ability to perform his assigned tasks as a Communications Division deputy effective June 21, 2016 and/or to be used for impeachment purposes;

12. Undated voicemail from Mark Richard to Kelly [last name unknown]; **[Plaintiff objects as irrelevant, unauthenticated, as hearsay within hearsay, unduly prejudicial, and because that alleged conduct was not any reason for the retaliatory demotion and subsequent termination.]  [Defendant responds by noting that this record fall under the business records exception to the rules against hearsay as they are records of the regularly conducted business activities of the St. Tammany Parish Sheriff's Office.  Defendant further notes that as this is a recording of the Plaintiff himself, no authentication by Defendant should be necessary.  Finally, this recording will also go to Plaintiff's credibility.]**

13. Any notes, diaries, letters, memorandum or writings of any kind or nature maintained by any party or witness in any way relevant to the events made the basis of this litigation; **[Plaintiff objects as vague and undefined, not previously produced in discovery (No known BATES numbers), irrelevant, unauthenticated, as hearsay within hearsay,  unduly prejudicial, and because the documents were not identified nor arguably provided prior to deposing various defendant employee.**

14. Any and all depositions admissible under the Federal Rules of Civil Procedure taken in connection with this matter.

15. Any and all written or videotaped statements taken in connection with this matter; **[Plaintiff objects as vague, not previously produced in discovery (No known BATES numbers), irrelevant, unauthenticated, as hearsay within hearsay, unduly prejudicial, and because the documents were not identified nor arguably provided prior to deposing various defendant employees.]**

16. The record of this proceeding, including all responsive pleadings and discovery contained herein;

17. Any and all affidavits that may be prepared regarding this matter; **[Plaintiff objects as vague, not previously produced in discovery (No known BATES numbers), irrelevant, unauthenticated, as hearsay within hearsay, unduly prejudicial, and because the documents were not identified nor arguably provided prior to deposing various defendant employees.]**

18. Any documents identified by any party or witness in this proceeding; **Plaintiff objects as vague given the undefined universe of this exhibit, as potentially irrelevant and unduly prejudicial, to the extent the records are unauthenticated, contain hearsay within hearsay, are not originals (contain highlighting and handwritten notes), lack proof of who created the record (such as the Million Dollar Road-related "statements), to the extent any records pertain to matters beyond the issues at hand (age and sex hostile environments, and retaliatory demotion and termination).**

19. Any and all documents or other evidence produced in discovery by any party to this litigation and/or obtained from any third-party by any party to this litigation; **[Plaintiff objects as vague, Plaintiff objects as vague, given the undefined universe of this exhibit, as potentially irrelevant and unduly prejudicial, to the extent the records are unauthenticated, contain hearsay within hearsay, are not originals (contain highlighting and handwritten notes), lack proof of who created the record (such as the Million Dollar Road-related "statements), to the extent any records pertain to matters beyond the issues at hand (age and sex hostile environments, and retaliatory demotion and termination).**

20. Any and all documents which the Plaintiff may use to support his claims.

## 11.   <u>DEPOSITION TESTIMONY:</u>

At present, the Parties do not intend to offer into evidence the deposition testimony of any witness in lieu of said witness' live testimony if that witness is available to testify at trial.  The parties reserve the right to use the deposition testimony of any and all witnesses appearing at trial for purposes of impeachment.  The Parties further reserve the right to use any and all deposition testimony of any witness, lay or expert, for any purpose allowed by the Federal Rules of Civil Procedure and/or the Rules of Evidence.

## 12.   <u>DEMONSTRATIVE AIDS USED IN OPENING OR CLOSING:</u>

**PLAINTIFF'S LIST OF DEMONSTRATIVE AIDS**
Plaintiff may use

 a.  a Chart to show categories and amounts of damages
 b.  Enlargements of exhibits and/or photographs
 c.  a power-point presentation, photographs, slides, charts, models, timeline of events, schematic diagrams and similar objects, which, although not offered as evidence, may be used in opening statement or closing argument.
  [Defendant **objects to said materials until such time as they are specifically identified and scrutinized for specific objections.]**

**DEFENDANT'S LIST OF DEMONSTRATIVE AIDS**

A:     Enlargements of exhibits and/or photographs

B:     Defendants may use a power-point presentation, photographs, slides, charts, models, schematic diagrams and similar objects, which, although not offered as evidence, may be used in opening statement or closing argument. **[Plaintiff prophylactically objects to said materials until such time as they are specifically identified and scrutinized for specific objections.]**

13.  **<u>WITNESSES:</u>**

**PLAINTIFF WILL CALL THE FOLLOWING WITNESSES:**

1) Plaintiff Mark Richard
   935 Gravier Street, Suite 2110
   New Orleans, LA 70112

   His employment with defendant, including the acts of discrimination and retaliation he was subjected to, as well as the damages suffered as a result thereof

2) Lt. Amy Poppler – on direct as a hostile witness
   St. Tammany Parish Sheriff's Office
   300 Brownswitch Road

   Slidell, LA 70458
   Plaintiff's employment with the St. Tammany Parish Sheriff's Office

3) Captain Donna Schlesinger– on direct as a hostile witness
   St. Tammany Parish Sheriff's Office
   300 Brownswitch Road
   Slidell, LA 70458
   Plaintiff's employment with the St. Tammany Parish Sheriff's Office

4) Captain Wayne Wicker– on direct as a hostile witness
   St. Tammany Parish Sheriff's Office

   300 Brownswitch Road
   Slidell, LA 70458
   Plaintiff's employment with the St. Tammany Parish Sheriff's Office

**PLAINTIFF MAY CALL THE FOLLOWING WITNESSES:**

1) Major Doug Sharp– on direct as a hostile witness
St. Tammany Parish Sheriff's Office
300 Brownswitch Road
Slidell, LA 70458
Plaintiff's employment with the St. Tammany Parish Sheriff's Office and the materially falsity of his affidavit submitted with STPSO's MSJ

2) Corporal Brittany Harbin – on direct as a hostile witness
St. Tammany Parish Sheriff's Office
300 Brownswitch Road
Slidell, LA 70458
Plaintiff's employment with the St. Tammany Parish Sheriff's Office and the materially falsity of her affidavit submitted with STPSO's MSJ

3) Lt. Brandy Toups– on direct as a hostile witness
St. Tammany Parish Sheriff's Office
300 Brownswitch Road
Slidell, LA 70458

Plaintiff's employment with the St. Tammany Parish Sheriff's Office and the materially falsity of her affidavit submitted with STPSO's MSJ

4) NOPD Special Operations Division – Commander Bryan J. Lampard
715 S. Broad St.
New Orleans, LA 70119
Facts regarding Plaintiffs' attempt to get hired by NOPD and the results of      Cmdr. Lampard's reference checking efforts involving STPSO – **Defendant objects as this individual was never identified on any of Plaintiff's Witness Lists filed into the record of this matter (See Rec. Docs. 38, 52 and 134).**

5) Adam Horton - address unknow at this time

**[Defendant objects as this individual was never identified on any of Plaintiff's Witness Lists filed into the record of this matter (See Rec. Docs. 38, 52 and 134). Plaintiff counters that this witness is for impeachment only.**

6) Vicky Esponge - address unknow at this time

**Defendant objects as this individual was never identified on any of Plaintiff's Witness Lists filed into the record of this matter (See Rec. Docs. 38, 52 and 134). Plaintiff counters that this witness is for impeachment only.**

7) Stephen Lang - address unknow at this time

**Defendant objects as this individual was never identified on any of Plaintiff's Witness Lists filed into the record of this matter (See Rec. Docs. 38, 52 and 134). Plaintiff counters that this witness is for impeachment only.**

8) Any witness listed by any other party;

9) Impeachment witness(es);

10) Rebuttal witness(es);

11) Any witness necessary to authenticate any document and/or exhibit offered into evidence;

12) Any witness identified in any discovery responses or documents produced or obtained in discovery;

13) Any witness or expert listed by any other party

14) Any witness necessary to authenticate any document and/or exhibit offered into evidence;

**DEFENDANT WILL CALL THE FOLLOWING WITNESSES:**

1.      Plaintiff, Mark Richard

2.      Deputy Chief Doug Sharp
        St. Tammany Parish Sheriff's Office
        300 Brownswitch Road
        Slidell, LA 70458
        Plaintiff's employment with the St. Tammany Parish Sheriff's Office

3.      Major Donna Schlesinger
        St. Tammany Parish Sheriff's Office
        300 Brownswitch Road
        Slidell, LA 70458
        Plaintiff's employment with the St. Tammany Parish Sheriff's Office

4.      Former Captain Wayne Wicker

St. Tammany Parish Sheriff's Office
79618 Hwy 21
Bush, LA 70431
Plaintiff's employment with the St. Tammany Parish Sheriff's Office

**DEFENDANT MAY CALL THE FOLLOWING WITNESSES:**

**(Plaintiff lodges a general objection to any "May Call" witnesses who are: 1)no longer employed with Defendant for whom no supplementation of discovery responses have been made, including reasons for termination/cessation of employment; 2) irrelevant; 3) cumulative; 4) whose contact information and/or full names have not been provided; 5) who may be called to offer "character assassination" testimony/opinions as to Plaintiff's actions, conduct and/or character; 6) who will testify to matters that occurred prior to the Fall of 2015; and 7) to the extent they do not have knowledge or information that relates to the issues at hand, namely, age and sexual hostile work environments and retaliation).**

1. Major Wharton Muller
St. Tammany Parish Sheriff's Office
300 Brownswitch Road
Slidell, LA 70458
Plaintiff's employment with the St. Tammany Parish Sheriff's Office

2. Deputy Patrick Penton
St. Tammany Parish Sheriff's Office
300 Brownswitch Road
Slidell, LA 70458
Plaintiff's employment with the St. Tammany Parish Sheriff's Office

3. Sergeant Amy Poppler
St. Tammany Parish Sheriff's Office
300 Brownswitch Road
Slidell, LA 70458
Plaintiff's employment with the St. Tammany Parish Sheriff's Office

4. Corporal Miranda Mobley
St. Tammany Parish Sheriff's Office
300 Brownswitch Road
Slidell, LA 70458
Plaintiff's employment with the St. Tammany Parish Sheriff's Office

6. Officer Leonard Holloway
Madisonville Police Department
403 Cedar St.
Madisonville, LA 70477

Plaintiff's employment with the St. Tammany Parish Sheriff's Office
**Objection – no longer at that address**

7.    Sgt. Emile Lobrano
St. Tammany Parish Sheriff's Office
300 Brownswitch Road
Slidell, LA 70458
Plaintiff's employment with the St. Tammany Parish Sheriff's Office

8.    Former Captain Richard Magee
Address Unknown
Plaintiff's employment with the St. Tammany Parish Sheriff's Office
**Objection**

9.    Former Employee Brittany Harbin
1004 Chestnut Court, Slidell, LA 70458
Plaintiff's employment with the St. Tammany Parish Sheriff's Office

10.    Representative(s) of Morris & McDaneil, Inc.
3351 Severn Avenue, Suite 101
Metairie, LA  70002
Plaintiff's employment with the St. Tammany Parish Sheriff's Office

11.    Melinda (last name unknown)
Identified during plaintiff's deposition as his former girlfriend**[Plaintiff objects as irrelevant, and unduly prejudicial.]**

12.    Kelly (last name unknown)
Identified during plaintiff's deposition as Melinda's employee/co-worker**[Plaintiff objects as irrelevant, and unduly prejudicial.]**

13.    Kile McLain
16543 Million Dollar Road
Covington, Louisiana
Identified during plaintiff's deposition as a witness to events on Million Dollar Road (March 18, 2018)
**Objection – no longer at that address**

14.    Michaela Rodosta
Identified during plaintiff's deposition as a witness to events on Million Dollar Road (March 18, 2018)
**Objection**

15.    Angela Frances Digerolamo
Address unknown

Plaintiff's ex-wife**[Plaintiff objects as irrelevant, and unduly prejudicial.]**

16. John J. Burke
Address unknown
Alleged harassment by plaintiff**[Plaintiff objects as irrelevant, and unduly prejudicial.]**

17. Whitney Turnbull
Address unknown
Alleged harassment by plaintiff**[Plaintiff objects as irrelevant, and unduly prejudicial.]**

18. Lauren Anglin
Address unknown
Alleged harassment by plaintiff**[Plaintiff objects as irrelevant, and unduly prejudicial.]**

19. Heather Doles
Former St. Tammany Parish Sheriff's Office Corporal
13275 Turtle Creek Parkway
Gulfport, MS  39503
**Objection**

20. Any witness listed by any other party;

21. Rebuttal/Impeachment witnesses including but not limited to;

Cpl. T.J. Schlesinger
St. Tammany Parish Sheriff's Office
300 Brownswitch Road
Slidell, LA 70458
Rebuttal/Impeachment witness
**Objection**

Matthew DePhillips
St. Tammany Parish Sheriff's Office
300 Brownswitch Road
Slidell, LA 70458
**Objection**

22. Any witness necessary to authenticate any document and/or exhibit offered into evidence;

23.   Any witness identified in any discovery responses or documents produced or obtained in discovery;

24.   Any witness or expert listed by any other party

25.   Any witness necessary to authenticate any document and/or exhibit offered into evidence;

**14.   JURY TRIAL**

This case is a jury case; the jury trial is applicable to all aspects of the case. Proposed jury instructions, special jury interrogatories, trial memoranda, and any special questions that the Court is asked to put to prospective jurors on *voir dire* shall be electronically filed with the Court not later than five working days prior to the trial date, unless specific leave to the contrary is granted by the Court.

**15.**   The issue of liability will not be tried separately from that of quantum.

**16.**   There are not any other matters that might expedite a disposition of this case.

**17.**   The trial shall commence on Monday August 30, 2021, at 9:00 a.m.  The trial should take five (5) days.

**18.**   This Pre-Trial Order has been formatted after conference at which Counsel for the respective parties have appeared in person.  Reasonable opportunity has been afforded Counsel for corrections or additions prior to signing.  Hereafter this Order will control the course of the trial and may not be amended except by consent of the parties and the Court, or by order of the Court to prevent manifest injustice.

**19.**   The possibility of settlement of this case was considered.  This Pre-Trial Order is submitted by all parties.

**20**.   **SIGNATURES**

**Respectfully submitted,**

**MILLING BENSON WOODWARD, LLP**

*s/ Chadwick W. Collings*
_____

**CHADWICK W. COLLINGS, T.A.**          **(#25373)**
**CHRISTOPHER R. BURGE**                **(#37005)**
**68031 Capital Trace Row**
**Mandeville, LA 70471**
**Telephone      (985) 292-2000**
**Fax            (985) 292-2001**
**Email:         ccollings@millinglaw.com**
*Attorneys for St. Tammany Parish Sheriff Randy Smith*

_s/ John O. Pieksen, Jr._

**John Oliver Pieksen , Jr., T.A. (# 21023)**
**Michael G. Bagneris (# 2658)**
**Bagneris, Pieksen & Associates, LLC**
**935 Gravier Street, Ste 2110**
**New Orleans, LA 70112**
**Telephone:    (504) 493-7990**
**Facsimile:     (504) 493-7991**
**pieksen@bpajustice.com**
_Attorneys for Plaintiff, Mark Richard_

Done at New Orleans, Louisiana this  12th  day of August, 2021.

**Hon. Martin L. C. Feldman**
**UNITED STATES DISTRICT JUDGE**